**Paul PHELPS, Plaintiff–Appellant,**

v.

**Wayne DUNN and Clark Edwards, Defendants–Appellees.**

**No. 91–5835.**

United States Court of Appeals, Sixth Circuit.

Argued Feb. 4, 1992.

Decided May 28, 1992.

Douglas L. McSwain, Ogden, Sturgill & Welch, Lexington, Ky., (argued and briefed), for plaintiff-appellant.

David A. Sexton, Asst. Atty. Gen., Linda G. Cooper, Office of Atty. Gen., Barbara W. Jones, John T. Damron (argued and briefed), Office of Gen. Counsel Corrections Cabinet, Frankfort, Ky., for defendants-appellees.

Before: NELSON and BOGGS, Circuit Judges; and KRUPANSKY, Senior Circuit Judge.

BOGGS, Circuit Judge.

Paul Phelps, a state prisoner, alleges that prison officials violated his rights under the Free Exercise Clause and Establishment Clause of the first amendment by denying him participation in prison religious services because he is a homosexual. The district court, 770 F.Supp. 346, granted summary judgment to defendants on the grounds that there were sufficient security concerns to justify their actions against the prisoner and that, in fact, he was not denied his right to practice his religion. We reverse and remand because there are genuine issues of material fact as to whether the prisoner posed a security risk and whether he was denied attendance at the religious services.

I

Plaintiff Paul Phelps is a state prisoner who was imprisoned at the Northpoint Training Center ("NTC") in Burgin, Kentucky for part of 1985, all of 1986, and most of 1987. Phelps is a practicing Christian and a homosexual. Phelps alleges that while at NTC he was denied equal participation and attendance at religious services in the prison chapel because of his homosexuality.

Upon entering NTC, and after discussing his homosexual status with the prison chaplain, Willie C. Polk, Jr., Phelps became an active participant in NTC's religious services. He sang at the services, both as a soloist and as part of a group, he sang with the New Hope Singers who performed for outside audiences, he served as chapel janitor, and he gave testimony during service. Chaplain Polk, knowing that Phelps was homosexual, did not object to this participation. Chaplain Polk felt that it was his responsibility to guarantee that all services were open for attendance and equal participation by all inmates, unless such attendance posed a security risk. At no time did Chaplain Polk view Phelps as a security risk.

Phelps participated in NTC religious services regularly for thirteen months without incident, until August 1986. At that time, Chaplain Polk went on vacation for two weeks and his regular services were conducted by one of NTC's volunteer chaplains, Rev. Clark Edwards, who had been conducting one or two services a week at NTC since he had signed on as a volunteer in February 1986. Phelps alleges that while Polk was on vacation, Phelps and Rev. Edwards had a conversation, disagreeing on whether Christians could be homosexuals. Phelps alleges that Rev. Edwards then denied him participation in the religious services because of Phelps's homosexuality. After this two-week period, tensions allegedly began to mount between pro- and anti-gay Christian factions of the prison community. However, Phelps continued his regular religious service activity under Chaplain Polk when he returned and throughout the fall. No incidents occurred during this time.

Sometime during the fall of 1986, Phelps told Rev. Edwards that the Lord had spoken to him while he was in the hospital with a spleen injury and that he was no longer homosexual. At that time, Rev. Edwards let Phelps sing solos and give testimonies at his Tuesday night services. This participation was subsequently denied when Phelps was caught in a homosexual act and once again acknowledged his homosexual identity. On December 2, 1986, Phelps asked Rev. Edwards if he could give testimony that night in Rev. Edwards's regular Tuesday night service. Rev. Edwards denied the request, citing security risks. Rev. Edwards was then allegedly warned that some members of the congregation were planning a demonstration of some sort. That night, Rev. Edwards conducted the entire service himself. At one point, Phelps stood up as if to speak. Captain Sims, who had, at Rev. Edwards's request, attended the service with some other officers to curb potential problems, then entered the Chapel from the foyer. Phelps, after expressing how glad he was to be attending the service, immediately sat

down, and no other incidents occurred that night.

While it is possible that this event could have been found to show that Phelps was a security risk, the issue was eventually adjudicated after Phelps filed an Inmate Grievance on December 5, 1986, claiming that Rev. Edwards had denied him equal participation in the December 2 service. Deputy Warden Wayne Dunn, in an informal resolution on December 11, 1986, upheld Rev. Edwards's decision, stating:

> All inmates are *encouraged* to attend any religious service, study or program. If Mr. Phelps wants to lead a service by speaking, singing, et cetera, this is not acceptable because of his admitted homosexual activity. The other men attending the services support the position taken by the volunteer chaplain.

J.A. at 22.

Phelps then appealed to the full Grievance Committee, which included Deputy William Bain, the direct supervisor of Chaplain Polk. On December 24, 1986, the Committee found that

> Mr. Phelps is not barred from services; but he is a controversial figure due to his sexual preference (homosexual). The Chaplain Chief, Willie Polk, sees no wrong in his taking part in services and leadership. However, the volunteer Chaplain, Rev. Edwards, does not concur in members of the Gay Community leading the worship service. Deputy Warden Wayne Dunn, whose responsibilities include our Chapel and Religious Programs, concurs with Rev. Edwards.
>
> Recommendations: If Mr. Phelps [sic] leadership in the Chapel Service is causing disruption with trauma which is damaging the overall program, he should not be allowed a leadership role. Whereas, if it is only a minority of two residents objecting to Mr. Phelps [sic] leadership role, then he should be allowed full participation. . . .

J.A. at 23.

Phelps then appealed to the next level, Warden Dewey Sowders, who, on January 13, 1987, held:

> I do not agree with the philosophy that only certain inmates should be permitted roles in chapel activities. All inmates should be afforded the opportunity to participate in leadership roles regardless of sexual preference.

J.A. at 24.

In response to Warden Sowders's ruling, Chaplain Polk issued a memorandum on January 16, 1987, which stated in part:

> In response to inmate participation in chapel services and grievance # 976, please note the following mandates as given by Warden Dewey Sowders ... All religious activities conducted by NTC chapel volunteers or participated in by volunteers, must be at the access of the general inmate population. All inmates, Gay Christians and alleged homosexuals alike, must be provided the opportunity to actively participate in free religious expression.

J.A. at 25.

After some political infighting between the Warden and Deputy Warden, on February 2, 1987, Warden Sowders issued the following statement in response to Polk's memorandum:

> A memorandum dated January 16, 1987, issued by Chaplain Willie Polk contains inaccurate information that needs clarification. A grievance was filed by an inmate who *was being denied active participation* in religious services held at Northpoint Training Center. My decision on this issue was that *all* inmates should be given the opportunity to participate in worship services. The question of sexual preference was not considered in the decision.
>
> Northpoint offers a valuable service by providing denominational as well as nondenominational religious outlets for its residents. How can we who profess to be Christians make a judgment to include or exclude certain individuals who some may deem inappropriate based on sexual preference?

J.A. at 94 (emphasis in original).

In the trial court and on appeal, Phelps maintained, based on Warden Sowders's decision, that he was never found to be a

security risk and that Rev. Edwards and Deputy Dunn failed to enforce the Warden's grievance decision. Phelps asserts that Warden Sowders specifically required that he be allowed to participate in religious services, as he was not a security risk on account of his homosexuality. Yet, despite this decision, Phelps alleges that he was thereafter never allowed to participate in services or even enter the chapel. J.A. at 524. He alleges that he was subjected to continuous harassment and was threatened with "write-ups" and "lock-ups" if he attended services. Phelps claims he was retaliated against by being subject to three "write-ups" in the two weeks following Warden Sowders's decision. Until that time, Phelps had good custody "scores," received meritorious good time awards, and received a commendation from his dorm officers for his actions during emergency conditions in April 1986.

Phelps filed suit against Deputy Dunn and Rev. Edwards under 42 U.S.C. § 1983 in district court in October 1987. United States Magistrate Joseph Hood recommended summary judgment for the *plaintiff* on the issue of liability and assigning the case for trial on the issue of damages. The district court judge rejected this recommendation and directed the parties to file cross-motions for summary judgment. Phelps did not file for summary judgment but instead asked for a trial date. On remand, United States Magistrate Judge James Cook recommended summary judgment for *defendants*. The district court agreed and granted summary judgment on the grounds that there were sufficient security concerns to justify Deputy Dunn's actions. Phelps appeals, seeking reversal and remand for trial.

## II

### A

■ This court reviews a grant of summary judgment *de novo* and it uses the same test as used by the district court. *See EEOC v. University of Detroit*, 904 F.2d 331, 334 (6th Cir.1990). Under Rule 56(c), Fed.R.Civ.P., summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Canderm Pharmacal, Ltd. v. Elder Pharmaceuticals, Inc.*, 862 F.2d 597, 601 (6th Cir.1988). To be genuine, the dispute must concern evidence upon which "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

■ To meet this standard, "the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). It requires a determination of whether the party bearing the burden of proof has presented a jury question as to each element of its case. *Celotex*, 477 U.S. at 322, 106 S.Ct. at 2552; *Taylor v. Medtronics, Inc.*, 861 F.2d 980, 987 (6th Cir. 1988). "In other words, the movant could challenge the opposing party to 'put up or shut up' on a critical issue." *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir.1989).

The test for summary judgment is the same as for a directed verdict: "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252, 106 S.Ct. at 2512. Accordingly, viewing the evidence in the light most favorable to the nonmoving party, the court should determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52, 106 S.Ct. at 2512.

### B

■ Convicted prisoners do not forfeit all constitutional protections by reason of

their conviction and confinement in prison. *Bell v. Wolfish*, 441 U.S. 520, 545, 99 S.Ct. 1861, 1877, 60 L.Ed.2d 447 (1979). "Prison walls do not form a barrier separating prison inmates from the protections of the Constitution." *Turner v. Safley*, 482 U.S. 78, 84, 107 S.Ct. 2254, 2259, 96 L.Ed.2d 64 (1987). Inmates clearly retain some degree of first amendment protection. *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348, 107 S.Ct. 2400, 2404, 96 L.Ed.2d 282 (1987), citing *Pell v. Procunier*, 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974). Specifically, the fourteenth amendment prohibits a state from making a law prohibiting the free exercise of religion. *Cruz v. Beto*, 405 U.S. 319, 322, 92 S.Ct. 1079, 1081, 31 L.Ed.2d 263 (1972). The *Cruz* court held that if a prisoner, who is a Buddhist, was denied a reasonable opportunity of pursuing his faith comparable to the opportunity afforded fellow prisoners who adhere to conventional religious precepts, then there was clear discrimination by the state against the Buddhist religion. *Ibid.*

 However, a prisoner's exercise of constitutional rights can be limited by the fact of incarceration itself and by valid penological objectives, which include deterrence of crime, rehabilitation of prisoners, and institutional security. *O'Lone*, 482 U.S. at 348, 107 S.Ct. at 2404. When a prison regulation impinges on a prisoner's constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests. *Turner* 482 U.S. at 89, 107 S.Ct. at 2261; *O'Lone*, 482 U.S. at 349, 107 S.Ct. at 2404. This "reasonably related" standard ensures the ability of corrections officials to anticipate security problems and adopt innovative solutions to the intractable problems of prison administration, and it avoids unnecessary intrusion of the judiciary into problems particularly ill-suited to resolution by decree. *O'Lone*, 482 U.S. at 349, 107 S.Ct. at 2404. Thus, the *O'Lone* court upheld a prison regulation that restricted a group of Muslims for security reasons. However, in *Cruz*, the court held unconstitutional the actions of prison officials who simply denied an *individual* Buddhist prisoner "reasonable opportunity of pursuing his faith comparable

to the opportunity afforded fellow prisoners who adhere to conventional religious precepts...." *Cruz v. Beto*, 405 U.S. at 322, 92 S.Ct. at 1081. These cases indicate that an individual's freedom of religious expression cannot constitutionally be restricted to solve a perceived "group" security problem, unless all other similarly situated members of the supposed groups are likewise restricted.

This is not a case dealing with a prison regulation or policy that prohibits homosexuals generally from participating in religious services for security reasons. Nor does it concern the rights of other prisoners or pastors to have a service without those they may consider sinners. NTC's regulations state that the purpose of the prison's religious services is

To ensure the constitutional right of inmates to practice their religion, subject only to the limitations necessary to maintain institutional order and security....

NTC Reg. 23–01–01. NTC has no regulations that limit homosexual participation in religious services for security reasons. To pose a security risk, Phelps must be found to be such on an individual basis.

Volunteer chaplain Rev. Edwards maintained, and Deputy Dunn agreed, that Phelps should be excluded from any "leadership roles" in religious services because Phelps posed a "security risk." The district court held that insufficient evidence existed to contest the fact that Phelps posed a security risk. In granting summary judgment, the district court held that Deputy Warden Dunn's decision to bar Phelps from having a "leadership role" in religious services was "reasonably related to the penological interests of security and rehabilitation of inmates by providing religious programs for inmates as a whole."

The basic question in this case is whether any protected interest that Phelps had was infringed and, if so, whether there was an adequate reason for that infringement. For Phelps to defeat the summary judgment motion, there must be a genuine issue of material fact as to both of these items. With regard to the protected interest,

Phelps appears to be asserting an interest both in attending this particular service, and in "actively participating" in it.

 On appeal, Phelps claims that sufficient evidence, which the district court ignored, does exist that he was not a security risk and that instead he was discriminated against and banned from participating in religious services because of his homosexuality. Upon examining the record and hearing oral argument, we find sufficient factual disagreement to require a trial on whether Phelps posed a security risk and whether he was denied attendance at the prison's religious services.

The record indicates that a jury could reasonably find that Phelps did not pose a security risk. Both the prison warden and the prison chaplain determined that Phelps did *not* constitute a security risk. Under prison regulations, the prison chaplain (i.e., Chaplain Polk) is "[r]esponsible for security in the chapel." NTC Reg. 23–01–01. I.10 (July 1, 1983). In his affidavit, Chaplain Polk twice stated that at no time did Phelps pose a security risk because of his chapel participation or because of his sexual preference. At all times, Chaplain Polk allowed Phelps to participate in his religious services. Then, after Phelps was denied participation on December 2, 1986 by Rev. Edwards, Phelps went through the prison grievance procedure and appealed all the way up to the Warden, who reversed Deputy Dunn and held that Phelps should be allowed to participate in religious services. The Warden stated:

> I do not agree with the philosophy that only certain inmates should be permitted roles in chapel activities. All inmates should be afforded the opportunity to participate in leadership roles regardless of sexual preference.

Although appellees argue that Warden Sowders later retracted this holding by virtue of his letter to Chaplain Polk on February 2, 1987, it is not at all clear that the Warden changed his initial holding with this letter. The text of the letter, along with Warden Sowders's testimony, indicates that the letter merely rephrased his earlier holding in an attempt to refocus attention from the issue of homosexuality to the right of participation given to all inmates. Sowders's February 2, 1987 letter stated:

> My decision on this issue was that *all* inmates should be given the opportunity to participate in worship services. The question of sexual preference was not considered in the decision.... How can we who profess to be Christians make a judgment to include or exclude certain individuals who some may deem inappropriate based on sexual preference?

Additionally, it not at all clear that a finding was ever made in *any* of the grievance proceedings that Phelps did, in fact, pose a security risk. Deputy Dunn's initial holding, where he agreed with Rev. Edwards's exclusion of Phelps from the December 2 service, was not actually based on security reasons, but rather on Phelps's homosexual activity. "If Mr. Phelps wants to lead a service by speaking, singing, et cetera, *this is not acceptable* because of his admitted homosexual activity. Other men attending the services support the position taken by the volunteer chaplain." (emphasis added). The full grievance committee, in allowing the decision by Deputy Dunn and Rev. Edwards to stand, merely noted that Phelps was "a controversial figure due to his sexual preference" and that both Rev. Edwards and Deputy Dunn did "not concur [with Chaplain Polk] in members of the Gay Community leading the worship service." No decision or finding was made on whether Phelps actually posed a security risk.

In addition, Phelps's contention that he is not a security risk is supported by the affidavits of Chaplain Polk, Warden Sowders, Capt. Sims, and Phelps. As noted above, Chaplain Polk never thought or found that Phelps posed any sort of security risk to his chapel or religious services. Warden Sowders specifically held that Phelps be allowed to participate in religious services and should not be denied participation because of his sexual orientation. Implicit in this decision was a finding that Phelps did not pose any security risk. Additionally, Captain Sims testified that he

never considered Phelps to pose a security threat either in the chapel or on the prison grounds. Also, to substantiate their assertion that Phelps posed a security threat, the appellees rely only on the incident of December 2, 1986, where nothing actually happened. However, Phelps attests that discriminatory actions were taken against him both prior to and after that incident.

The district court, however, found that barring Phelps from a "leadership" role was reasonably related to penological interests and upheld Deputy Dunn's finding that Phelps was a security risk in spite of the Warden's holding on appeal to the contrary. The district court held "[t]he undersigned is of the opinion that *Warden Sowders's* decision is arbitrary and capricious," J.A. at 39 (emphasis added), and that:

> the warden lacked the courage to confront squarely the situation before him and to take the steps necessary to assure all inmates' right to practice religion while maintaining institutional order and security. Instead, he chose merely to grease the squeaky wheel.

J.A. at 41. Although the district court takes this view of the situation, when we examine the evidence in the light most favorable to the nonmoving party, there appears to be substantial factual disagreement (and thus sufficient disagreement to require a trial) on whether Phelps constituted a security risk. Both Warden Sowders and Chaplain Polk, the one in charge of the entire prison, the other in charge of the religious programs, found no such security risk. Their subordinates, Deputy Dunn and Rev. Edwards, now contend that actions, which they deny occurred, were justified on the basis of such a security risk. The district judge appears to agree with the subordinates, without allowing a fact-finder an opportunity to hear or weigh the obviously conflicting evidence. Assuming, without deciding, that a subordinate can ever justify actions on the basis of prison conditions over whose existence he disagrees with his superior, there certainly remains a genuine issue of material fact as to whether those conditions, the security risk posed by Phelps, actually existed.

C

With regard to the issue of simple attendance, Phelps provided affidavits claiming that he was denied the right to attend religious services. Phelps averred that after the December 2 incident and the subsequent ruling by Warden Sowders: he was prohibited from attending services after 13 months of regular attendance; he received three misbehavior "write-ups" in two weeks, while he previously had been lauded as an "honor inmate"; and he was allegedly threatened by prison guards. The record is incomplete as to whether Phelps received such "write-ups." Additionally, Warden Sowders testified that he was unsure if such "write-ups" occurred but that records of such "write-ups" could be retrieved from institutional files. However, he did testify that he remembered that something had happened to Phelps after his favorable decision, that some prison officials might have told Phelps to stay away from the services, and that Phelps might have been locked up. Similarly, Capt. Sims testified that Phelps had received "write-ups" after the favorable decision by Warden Sowders. On the other side, prison officials provided no evidence, except assertion, that no such retaliatory conduct occurred. The conflicting affidavits appear to present the paradigm of an issue of material fact that requires resolution by trial.

However, the district court's summary judgment holding was based on a distinction it, the appellees, and the magistrate made between "general participation" and "active participation" or "leadership roles." The court held the appellees' actions did not bar Phelps from generally participating in religious services, but rather merely denied him an active leadership role. Phelps objects to this distinction between mere participation and active leadership, claiming that he was only asking for and was denied general participation rights. Thus, there is a factual issue of what constitutes "participation in religious services" and whether such participation was denied to Phelps.

With regard to the question of "participation," a denial of attendance would, of course, obviously constitute a denial of participation as well, whether "general" or "active." With the exception of the December 2 service, which Rev. Edwards chose to conduct entirely himself, and which thus did not in any way discriminate between Phelps and other inmates, neither side alleges instances where Phelps was allowed to attend but not "participate."

But, in the absence of quite specific evidence of concrete discrimination on an impermissible ground, federal courts should not become involved in determining questions of selection of lay people for liturgical participation. They should no more review the general choice of soloists and readers from among a group of candidates than they should review the choice of second baseman or prison trustys. In addition, the prison's policies and other policies against "discrimination on the basis of religion" do not apply to the choice of persons to participate in religious services.

Therefore, it appears that the question of what constitutes "active participation" is not presented on this set of facts. The question of attendance, however, is squarely presented and raises a genuine issue of material fact as to whether an injury was done to a protected interest.

### III

On appeal, both parties agree that the district court also granted summary judgment for appellees on the grounds that Phelps could not bring a § 1983 action against Rev. Edwards because he was not a state actor. Neither party had raised or briefed this issue before the district court. The magistrate found that Rev. Edwards was not a state actor. However, although the district court's ruling was based on adoption of the magistrate's recommendations, the court never actually ruled on the state actor issue.

The court does not agree with the plaintiff's contention that the Magistrate erred in his finding with regard to defendant Edwards. The question of whether the defendant was acting under color of state law is moot, however, in view of the ultimate conclusion reached by the undersigned.

J.A. at 35. Thus the district court did not rule for defendants on this ground.

In finding that Rev. Edwards was not a state actor, the magistrate relied on *West v. Atkins*, 487 U.S. 42, 49, 108 S.Ct. 2250, 2255, 101 L.Ed.2d 40 (1988):

"The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" "To constitute state action, 'the deprivation must be caused by the exercise of some right or privilege created by the State ... or by a person for whom the state is responsible,' and 'the party charged with the deprivation must be a person who may fairly be said to be a state actor.'"

J.A. at 52. (citations omitted)

The Magistrate then reasoned that

Notwithstanding the agreement between NTC and Edwards, whereby Edwards was permitted to conduct religious services at NTC, Edwards, while performing his ministerial duties of interpreting and preaching the words of the Bible, retained the essential attributes of a chaplain performing religious services in a non-prison setting. To this extent he is independent of the state....

J.A. at 55.

However, in order for Rev. Edwards to become a volunteer chaplain at the NTC prison he had to meet all the criteria established by the NTC Citizen Involvement and Volunteer Services Program. NTC Reg. 26–01–01. This program "operate[s] under the auspices and guidelines established by the Kentucky Corrections Cabinet" and "[t]he Volunteer selection process is *similar to that used for selecting paid personnel....*" NTC Reg. 26–01–01.F (emphasis added).

Most importantly, the regulations require that "[a]ll volunteers shall sign an agreement to abide by all institutional poli-

cies and procedures." NTC Reg. 26–01–01.J. Volunteers must report to the established line of chapel command. The regulations also provide that volunteers "shall be issued an institutional identification card upon completion of the training and orientation required for the task...." NTC Reg. 26–01–01.I. Finally,

> [v]olunteers are trained individuals providing services on a regular basis; therefore, are [sic] distinguished from guest speakers, musicians, or other guests who are not "trained" by Corrections personnel and do not provide regular scheduled services. Guests do not receive institutional identification cards.

NTC Reg. 26–01–01.N.

By signing this contract to become a volunteer chaplain at NTC, Rev. Edwards agreed to abide by NTC's regulations and policies, including NTC Reg. 23–01–01 that guarantees all inmates the freedom to practice religion, subject to security restrictions. The purpose of having and regulating prison religious services is "[t]o ensure the constitutional right of inmates to practice their religion, subject only to the limitations necessary to maintain institutional order and security...." NTC Reg. 23–01–01 (July 1, 1983). Phelps alleges that Rev. Edwards violated the prison policies, as interpreted by Warden Sowders's decision, by participating in barring him from attending chapel, and by interfering with his right to practice his religion for reasons not related to security.

In *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982), the Supreme Court set forth a two-part test for determining whether the actions of a private party causing the deprivation of a federal right are attributable to the state. First, the deprivation must be caused by the exercise of some right or privilege created by the state or by a rule of conduct imposed by the state or by a person for whom the state is responsible. *Id.* at 937, 102 S.Ct. at 2753. Second, the party charged with the deprivation must be a person who may fairly be said to be a state actor. This may be because he is a state official, because he has acted together with or has obtained significant aid from state officials, or because his conduct is otherwise chargeable to the state. *Ibid.*

Here Rev. Edwards's right to conduct services in the prison chapel was a privilege created by the state. As to whether Rev. Edwards may fairly be said to be a state actor, *Lugar* requires "something more" than mere action pursuant to governmental authority. Whether "something more" exists, which would convert a private party into a state actor, varies with the circumstances of the case. *Id.* at 939, 102 S.Ct. at 2754.

By signing the contract, Rev. Edwards agreed to operate under all institutional policies and procedures of the NTC. A volunteer chaplain functions as part of and within the institutional structure of chapel command. He is distinguished from guests and visitors by being given privileges granted only to NTC employees, including special training and an institutional identification card. While Rev. Edwards may well have retained the general attributes of a clergyman performing in a non-prison setting when he was conducting services, Rev. Edwards was not in a non-prison setting. Rather, he was working in a prison and had signed an agreement that specifically restricted him from denying prisoners access to religious services on the basis of his own religious beliefs. Thus, even if the district court had relied on state action grounds, that decision would not have been correct under these factual circumstances.

We REVERSE the district court, holding that summary judgment is inappropriate as genuine issues of material fact exist as to whether Phelps posed a security risk and was denied participation in religious services. We REMAND for further proceedings consistent with this opinion.

DAVID A. NELSON, Circuit Judge, concurring in part and dissenting in part.

I agree that the record presents a genuine issue of fact as to whether Deputy Warden Dunn improperly barred Mr. Phelps from attending religious services. No such issue is presented, in my view, with respect to the Rev. Mr. Edwards.

Rev. Edwards gave a sworn deposition in which he testified that he "specifically let [Mr. Phelps] know that he was welcome in my service and congregation at any time." It was only when Phelps asked what it would take for him to be allowed to lead the singing or sing a "special" that Rev. Edwards told him "he would have to be Biblical." (The men looked at the scriptures together, and Rev. Edwards pointed out passages that he interpreted as saying that homosexuality is not permitted for Christians.) It is undisputed that Phelps was given to understand that he could not participate in leading the singing or in singing solos as long as he engaged in what Rev. Edwards referred to as "active gay practice." [1] Rev. Edwards repeatedly testified, on the other hand, that he never barred Paul Phelps from *attending* services.

What prompted Mr. Phelps to initiate this lawsuit was the denial of "equal participation" in the chapel services. That is what Mr. Phelps said in the affidavit he filed subsequent to the taking of Rev. Edwards' deposition, and that is what he said in his original complaint. (That complaint did not accuse Rev. Edwards of barring Phelps from attendance at religious services; what it said, rather, was that the defendants "denied me an active part in religious services. . . .")

It is true that Mr. Phelps' affidavit cites one occasion on which Rev. Edwards is supposed to have said "that a practicing homosexual was not allowed to attend his services and that I was not welcome in the chapel." The next sentence of the affidavit, however, says that Phelps brought this incident to the attention of Capt. Sims, who "instructed Edwards that he could not deny me equal participation in chapel services." Phelps continued to go to the services—there is no dispute about this—and he complains that Rev. Edwards, together with Deputy Warden Dunn, "barred me from being an *active participant* in the chapel services." (Emphasis supplied.) Both Phelps and Rev. Edwards draw a distinction between active participation and simple attendance.

Phelps' affidavit indicates that there came a time Phelps was "effectively barred," from the chapel, but it is Deputy Warden Dunn who is said to have kept him away:

> "Although Deputy Dunn was not the warden responsible for religious services, he still effectively barred me from the chapel. During the early stages of my grievance, defendant Dunn instructed or allowed Capt. Sims to tell me that if I continued to keep coming to chapel I would be locked up. Effectively, Dunn did keep me out of the chapel by continually having me written up or locked up."

Given Rev. Edwards' unequivocal testimony that he (Rev. Edwards) never barred Paul Phelps from attending services, it does not seem to me that Phelps' affidavit is sufficient to create a triable issue of fact as far as Rev. Edwards is concerned. [2] I would therefore affirm the judgment of the district court in favor of Rev. Edwards.

---

**1.** Rev. Edwards indicated that he had "security reasons" for not wanting active homosexuals to lead the singing or give testimony, but he said he also had "conviction reasons." The deposition never mentions such considerations as concern over the spread of AIDS, or the fact that the practices in which Phelps engaged violated prison regulations and Kentucky law; Rev. Edwards' real concern, as his deposition makes very clear, was that people who openly flouted what Rev. Edwards took to be the teachings of the Bible should not be selected to lead the liturgy. My colleagues on the panel have concluded that the courts could not properly interfere with Rev. Edwards' freedom of choice in such matters, and I fully agree.

**2.** An interesting question would have been presented if Rev. Edwards had sought to bar Phelps from even attending the services and had cited doctrinal reasons for doing so. Rev. Edwards said he had no problem with allowing all inmates to attend, however; just as in churches outside, homosexuals "would be welcome as they could be in the congregation."