# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

DENNIS FLORER,
             *Plaintiff-Appellant,*

v.

CONGREGATION PIDYON SHEVUYIM,
N.A. Contract Chaplaincy; GARY
FRIEDMAN, Contract Chaplain;
JEWISH PRISONERS SERVICES
INTERNATIONAL, Contract
Chaplaincy,
             *Defendants-Appellees.*

No. 07-35866

D.C. No.
CV-06-01465-RSM

OPINION

Appeal from the United States District Court
for the Western District of Washington
Ricardo S. Martinez, District Judge, Presiding

Argued and Submitted
December 9, 2009—Seattle, Washington

Filed April 15, 2011

Before: Robert R. Beezer, Ronald M. Gould and
Richard C. Tallman, Circuit Judges.

Opinion by Judge Gould

## COUNSEL

Ian Cairns (argued), Theresa DeMonte, and Alysha Yagoda (argued), law students at the University of Washington Law School, Seattle, Washington, supervised by Eric Schnapper, University of Washington Law School, Seattle, Washington, and Leonard J. Feldman, Stoel Rives LLP, Seattle, Washington, for the plaintiff-appellant.

Robert M. McKenna, Washington Attorney General, Sara J. Olson (argued), Assistant Washington Attorney General, and Andrew D. Tsoming (intern), Olympia, Washington, for the defendants-appellees.

**OPINION**

GOULD, Circuit Judge:

Plaintiff-Appellant Dennis Florer, a Washington State prisoner, filed a 42 U.S.C. § 1983 and Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA") action against Congregation Pidyon Shevuyim, N.A. ("CPSNA"), a Jewish organization that contracted with the Washington State Department of Corrections ("DOC") to provide Jewish religious services to prisoners; Jewish Prisoners Services International ("JPSI"), an outreach program of CPSNA; and Rabbi Gary Friedman, president of CPSNA and chairman of JPSI (collectively "Defendants"). The district court granted summary judgment for Defendants, concluding that Florer had not named a state actor as a defendant. Florer timely appealed. We have jurisdiction pursuant to 28 U.S.C. § 1291, and we affirm.

**I**

We must decide whether Defendants, private entities operating as contract chaplains within the Washington State prison system, were "state actors" for purposes of § 1983 and RLUIPA when they declined Florer's request for a Torah, a Jewish calendar, and a rabbi visit on the ground that they did not consider Florer to be Jewish. We hold that, in the circumstances here, Defendants were not state actors.

From 2000 until 2005, CPSNA, through its president, Rabbi Gary Friedman, contracted with the Washington State DOC to provide Jewish religious services to prisoners. The contract required CPSNA, through contract chaplains (including Friedman, though Friedman did not receive a wage), to "provide religious training on essential Jewish religious practices to Department of Corrections' offenders who request this service. The services will include religious instruction and assistance with Jewish problems in all prisons located in

Washington State." In 2001, this provision was amended to include language specifying that "[t]he Contract Chaplain will provide instruction and guidance to offenders in order to facilitate spiritual growth. While at a local prison facility, the Facility Chaplain/Chaplain Supervisor will coordinate services with the Contract Chaplain."[1] The amendment also said that "[t]he Contract Chaplain and Facility Chaplain shall work cooperatively to meet the religious needs of Jewish offenders at the facility." In 2003, the parties again amended this provision by adding, "Services will be open to all offenders, however, the Jewish authorities will determine who can participate in liturgical related activities."

The contract specified that contract chaplains were "*not* employees or agents of the Department [of Corrections]," and it forbade contractors from claiming to be "an officer or employee of the Department or of the state of Washington." It also required that CPSNA comply with DOC policies. In particular, two DOC Policy Directives described the roles of prison staff and contract chaplains. DOC Policy Directive 560.200 tasked the Religious Program Manager, a DOC employee, with ensuring "that the religious/spiritual needs of offenders are appropriately met" and providing "leadership and guidance to Chaplains and religious volunteers. It also required each prison to employ at least one facility chaplain for "coordinating and supervising religious activities and community resources to meet the expressed religious needs of offenders." The Directive permitted the use of contract chaplains "to meet the needs of specific religious/faith groups." The Directive further stated that offenders should have reasonable access to religious activities and instruction as well as religious items. According to the Directive, religious "[i]tems must be: (a) Requested through the facility Chaplain; (b) Procured in accordance with established mail and property procedures; (c) Obtained from Office of Correctional Operations (OCO)-approved *authorized religious vendors*; (d) Issued by

---

[1]Facility chaplains, unlike contract chaplains, are DOC employees.

the facility Chaplain and appropriately documented; and (e) Not altered."

An additional Policy Directive, 560.100, outlined the responsibilities of facility chaplains and contract chaplains. Among other responsibilities, the facility chaplains "coordinate religious activities to meet identified and requested offender needs" and "[a]ssist and refer the offenders . . . to religious assistance programs and agencies in the community as appropriate." Under the Policy Directive, contract chaplains, working under the guidance and supervision of the facility chaplain, were "expected to attend to the spiritual needs of offenders for their specific denomination or religious group" by facilitating the development of religious education and training opportunities for offenders and DOC staff, referring offenders to religious assistance programs and agencies in the community, conducting denominational religious services for offenders, providing spiritual guidance to offenders as requested, and suggesting changes in DOC policy or procedure when appropriate.

In 2004, while incarcerated in Washington State Penitentiary, Florer identified his religious preference as "Jewish" on the DOC's Religious Preference form. He also requested a Torah, a Jewish calendar, and a rabbi visit. Washington State Penitentiary Facility Chaplain William Peck received these requests. Peck told Florer that, at the time, "no Jewish rabbis visited [Washington State Penitentiary] to speak to inmates." Peck also determined that the Penitentiary did not have any donated copies of the Torah or a Jewish calendar to give to Florer. Peck informed Florer of that fact, and then referred Florer's request to JPSI. In May 2004, Florer sent a letter to JPSI. The letter primarily complained about the quality of the kosher diet in prison, but it also mentioned that his request for a Torah and a rabbi visit had gone unanswered. The next month, Florer sent another letter to JPSI, again complaining about the kosher diet, and stating that "[t]he Chaplain will not send me a Talmud, Torah, or anything else. No one comes to

see me out here." Florer then phoned Friedman, the chair of JPSI and president of CPSNA. Though the details of that conversation are disputed, we assume for purposes of this appeal that Florer asked Friedman to provide him with a Torah, a Jewish calendar, and a visit from a rabbi. Friedman asked if Florer was born to a Jewish mother or if he had converted to Judaism. During their discussion, Friedman explained that he did not view Florer as Jewish. Friedman sent Florer a blank copy of JPSI's Prisoner Information form, but there is no evidence that Florer completed the form or sent it back to Friedman, JPSI, or CPSNA. We assume for purposes of this appeal that Friedman rejected Florer's request for religious materials and a rabbi visit on the ground that Friedman believed Florer was not Jewish.

In November 2006, after allegedly exhausting his administrative remedies,[2] Florer filed a pro se complaint alleging that Defendants burdened his religious freedom in violation of RLUIPA and the First Amendment of the Constitution. Florer alleged that Defendants "refused to provide basic religious reading materials, other basic materials, and spiritual leadership." He further alleged that Defendants were "allowed by the [DOC] to dictate which prisoners receive the aforesaid [religious materials and leadership] and which do not." Florer also claimed that Defendants were contractually prohibited from denying requests for religious materials and leadership, and that they were state actors due to their contractual relationship with DOC. Defendants filed a motion to dismiss, which the district court converted to a motion for summary judgment. Florer then filed a cross-motion for summary judgment. After full briefing by both parties, the district court granted summary judgment for Defendants on the ground that Florer had not named a state actor.

---

[2]The district court did not reach the question of exhaustion, and it is not necessary for us to do so here.

## II

We review de novo a district court's decision to grant summary judgment. *FTC v. Stefanchik*, 559 F.3d 924, 927 (9th Cir. 2009). "We view the evidence in a light most favorable to the non-moving party and decide whether there are any genuine issues of material fact and whether the district court correctly applied the substantive law." *Id.*

## III

[1] Florer seeks relief under § 1983 and RLUIPA. To state a claim under § 1983, Florer "must allege a violation of his constitutional rights and show that the defendant's actions were taken under color of state law." *Gritchen v. Collier*, 254 F.3d 807, 812 (9th Cir. 2001). Similarly, under RLUIPA, Florer must show that a "government" has imposed a substantial burden on his religious exercise. 42 U.S.C. § 2000cc-1(a). RLUIPA defines "government" to include a "person acting under color of State law." 42 U.S.C. § 2000cc-5(4)(A)(iii).[3]

As relevant to this appeal, our inquiry to determine whether a defendant acted "under color of state law" is the same under RLUIPA as it is under § 1983. Congress passed RLUIPA in response to the Supreme Court's partial invalidation of the Religious Freedom Restoration Act ("RFRA"). *Cutter v. Wilkinson*, 544 U.S. 709, 715 (2005). RFRA defined "government" to include a "person acting under color of law." 42 U.S.C. § 2000bb-2(1). RLUIPA's definition of "government"

---

[3]Defendants do not challenge, and we do not decide, RLUIPA's application to private actors sued for damages in their individual capacity. The Fifth, Seventh, and Eleventh Circuits have held that RLUIPA does not provide an action for damages for individual-capacity claims. *See Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 327-28 & n.23 (5th Cir. 2009); *Nelson v. Miller*, 570 F.3d 868, 889 (7th Cir. 2009); *Smith v. Allen*, 502 F.3d 1255, 1272-75 (11th Cir. 2007). The Ninth Circuit has not ruled on this issue in a precedential opinion, and we reserve this question for another day.

is nearly identical. § 2000cc-5(4)(A)(iii). When we interpreted RFRA, we adopted "the judicial interpretation of the phrase 'acting under color of law,' as used in 42 U.S.C. § 1983," holding that it applied equally in RFRA actions. *Sutton v. Providence St. Joseph Med. Ctr.*, 192 F.3d 826, 835 (9th Cir. 1999). We similarly apply our interpretation of § 1983's "color of state law" clause to Florer's RLUIPA claims. *See Bragdon v. Abbott*, 524 U.S. 624, 645 (1998) ("When administrative and judicial interpretations have settled the meaning of an existing statutory provision, repetition of the same language in a new statute indicates, as a general matter, Congress' intent to incorporate such interpretations as well.").

**[2]** The Supreme Court has explained that "[t]he traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.' " *West v. Atkins*, 487 U.S. 42, 49 (1988) (quoting *United States v. Classic*, 313 U.S. 299, 326 (1941)). To determine whether actions that allegedly caused the deprivation of a right are fairly attributable to the state even though they were committed by private actors, we follow a two-part approach: "First, the deprivation must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the state or by a person for whom the State is responsible." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982). "Second, the party charged with the deprivation must be a person who may fairly be said to be a state actor." *Id.* We start with the presumption that conduct by private actors is not state action. *Sutton*, 192 F.3d at 835. Florer bears the burden of establishing that Defendants were state actors. *See Flagg Bros. v. Brooks*, 436 U.S. 149, 156 (1978).

## IV

**[3]** We begin with the first step of the analysis: whether the deprivation is the result of a governmental policy. *See Sutton*,

192 F.3d at 835 (citing *Lugar*, 457 U.S. at 937). Florer contends that Defendants impermissibly burdened his religious exercise in violation of RLUIPA and the First Amendment of the Constitution. He alleges that he was deprived of his religious freedom by Defendants' refusal to provide him with a Torah, a Jewish calendar, and a rabbi visit. Stated another way, Florer alleges that he was deprived of his free exercise rights by Defendants' policy of only providing religious materials and rabbi visits to individuals that Defendants determined were Jewish according to particular criteria. But if Defendants indeed have such a policy, it is their own: it is not "the exercise of some right or privilege created by the State or by a rule of conduct imposed by the state or by a person for whom the State is responsible." *Lugar*, 457 U.S. at 937. Florer has offered no evidence that Defendants were enforcing a DOC or governmental policy prohibiting him from consulting with a rabbi or possessing a Torah or calendar, or that Defendants' internal policy was adopted by the DOC.

**[4]** Florer does allege that Defendants were "allowed by the [DOC] to dictate which prisoners receive the aforesaid [religious materials and leadership] and which do not," and that the DOC relied on Defendants' determination to decide whether Florer "should receive a Torah and a Jewish calendar." But Defendants cannot be said to "dictate" to whom the DOC will provide religious materials and rabbi visits, because the DOC does not directly provide such things. On appeal, Florer asserts that "[D]efendants have exclusive control over inmates' access to religious services to which the state is constitutionally obligated to provide access." But the record indicates that Florer had the opportunity to make phone calls and write letters to contact religious organizations outside the prison, and that he actually did so. There is nothing in the record that indicates that Defendants blocked his access to other religious communities or his ability to request religious materials and information from other individuals and organizations.

Even under a liberal construction,[4] at most Florer's complaint and cross-motion for summary judgment contend that Defendants helped DOC staff determine whether other prisoners should be classified by the DOC as Jewish. But Florer has not produced any evidence that the DOC did not classify him as Jewish. Whether the DOC classified others as non-Jewish based on Defendants' advice or direction is not relevant to this appeal because, even if true, it would not establish that Florer's rights were deprived by such a policy. For the same reason, Florer's contention that the DOC relied on Defendant Friedman's advice to determine which prisoners would receive kosher food is unavailing. Florer does not claim that he was removed from the DOC's kosher diet.

**[5]** Florer simply has not come forward with evidence to show that Defendants fostered or furthered any government policy that blocked him from obtaining religious materials or leadership from other sources. *Cf. Cruz v. Beto*, 405 U.S. 319, 323 (1972) (Burger, C.J., concurring) ("There cannot possibly be any constitutional or legal requirement that the government provide materials for every religion and sect practiced in this diverse country. At most, [religious] materials cannot be denied to prisoners if someone offers to supply them."). While Florer has provided some evidence that the DOC staff referred him only to Defendants, instead of actively seeking other religious service providers to meet his requests, the DOC is not a defendant in this action. Even if Defendants were the only Jewish organizations operating within the DOC, that fact, standing alone, does not transform Defendants' internal policy into governmental policy. We hold that the alleged deprivation was not caused by exercise of governmental policy and does not satisfy the first step of the *Lugar* analysis.

---

[4]"A document filed *pro se* is 'to be liberally construed,' and 'a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers.'" *Erickson v. Pardus*, 551 U.S. 89 (2007) (quoting *Estelle v. Gamble*, 429 U.S. 97, 106 (1976)) (citations omitted).

# V

Even if Florer satisfied the first step of the *Lugar* analysis, he still fails the second: whether the party charged with the deprivation can be fairly considered a state actor. "In order for private conduct to constitute governmental action, 'something more' must be present." *Sutton*, 192 F.3d at 835. The Supreme Court has instructed that "state action may be found if, though only if, there is such a 'close nexus between the State and the challenged action' that seemingly private behavior 'may be fairly treated as that of the State itself.' "[5] *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001) (quoting *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351 (1974)). Courts have employed various approaches to determine whether a person may fairly be considered a state actor. *Lee v. Katz*, 276 F.3d 550, 554 (9th Cir. 2002). "What is fairly attributable is a matter of normative judgment, and the criteria lack rigid simplicity. . . . [N]o one fact can function as a necessary condition across the board for finding state action; nor is any set of circumstances absolutely sufficient, for there may be some countervailing reason against attributing activity to the government." *Brentwood Acad.*, 531 U.S. at 295-96.

"Because of the fact-intensive nature of the inquiry, courts have developed a variety of approaches" to assess whether a private party has acted under color of state law. *Lee*, 276 F.3d at 554. The Supreme Court has identified at least seven such

---

[5]The Supreme Court has noted a doctrinal distinction between "state action" and acts "under color of state law." *Lugar*, 457 U.S. at 935 & n.18 (holding that "although . . . conduct satisfying the state-action requirement . . . satisfies the statutory requirement of action under color of state law," the converse is not necessarily true). However, any distinction is immaterial for purposes of this appeal. "Where, as here, deprivations of rights under the Fourteenth Amendment are alleged, these two requirements converge." *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 n.8 (1999). In this opinion, we refer to "state action" and "acts under color of state law" interchangeably.

approaches. *Brentwood Acad.*, 531 U.S. at 296. "Satisfaction of any one test is sufficient to find state action, so long as no countervailing factor exists." *Kirtley v. Rainey*, 326 F.3d 1088, 1092 (9th Cir. 2003).

On appeal, Florer urges that Defendants are state actors under either the "public function" or "joint action" approach. We discuss each in turn.

**A**

"Under the public function test, when private individuals or groups are endowed by the State with powers or functions governmental in nature, they become agencies or instrumentalities of the State and subject to its constitutional limitations." *Lee*, 276 F.3d at 554-55 (internal quotation marks omitted). "The public function test is satisfied only on a showing that the function at issue is 'both traditionally and exclusively governmental.'" *Kirtley*, 326 F.3d at 1093 (quoting *Lee*, 276 F.3d at 555).

Florer relies on *West v. Atkins*, in which the Supreme Court held that a private physician employed by the state on a contract basis to provide medical services to inmates acted under color of state law when treating a prisoner's injuries. 487 U.S. at 54. Florer contends that Defendants contracted with the DOC to provide religious services to inmates, and that Defendants, like the physician in *West*, were state actors because they had "exclusive control over inmates' access to religious services to which the state is constitutionally obligated to provide access." But the comparison to *West* is flawed. In *West*, state law barred the prisoner from receiving medical care from anyone other than the state's designated physicians. *Id.* at 44 n.2, 55. But Florer has not shown that any law or policy restricted him from receiving a Torah, calendar, or rabbi visit from persons or organizations other than Defendants. Moreover, in *West*, the prison was required by the Eighth Amendment and state law to provide health services to its prisoners.

*Id.* at 54-55 & n.13. The prison fulfilled that responsibility by hiring contract physicians. *Id.* at 55. Florer contends that the DOC likewise fulfills its "constitutional obligation to accommodate prisoners' free exercise rights" by employing contract chaplains. But the DOC is not under a comparable duty to provide religious materials and services to inmates; rather, the DOC must provide reasonable opportunities to exercise religious freedom. *Cruz*, 405 U.S. at 322 & n.2; *Cutter*, 544 U.S. at 720 n.8. Florer has not presented evidence showing that the DOC delegated to contract chaplains its obligation to provide reasonable opportunities to exercise religious freedom. On the contrary, one way that the DOC fulfills its responsibility is by hiring contract chaplains.

**[6]** *West* also stated that the fact that contract physicians were professionals acting in accord with professional discretion and judgment, standing alone, did not remove them from the purview of § 1983. 487 U.S. at 52. Yet the Court cautioned that it did "not suggest that this factor is entirely irrelevant to the state-action inquiry." *Id.* at 52 n.10. Rather, the Court explained that, "[w]here the issue is whether a *private* party is engaged in activity that constitutes state action, it may be relevant that the challenged activity turned on judgments controlled by professional standards, where those standards are not established by the State." *Id.* Such is the case with contract chaplains. Defendants's professional standards governing who is a member of their religion are not dictated by the state. We cannot say that Defendants denied Florer's request "on the basis of some rule of decision for which the State is responsible." *Id.* "This is essentially a private function . . . for which state office and authority are not needed." *Polk Cnty. v. Dodson*, 454 U.S. 312, 319 (1981).

**[7]** *Montano v. Hedgepeth* supports our conclusion. 120 F.3d 844 (8th Cir. 1997). There, the Eighth Circuit observed that "[t]he teachings endorsed and practiced by recognized spiritual leaders are not, and should not be, subject to governmental pressures, and the canons which underlie most of the

world's denominations are typically thought to derive from divine, rather than worldly, inspiration." *Id.* at 850. The *Montano* court held that "a prison chaplain . . . is not a state actor when he engages in inherently ecclesiastical functions (that is, when he performs spiritual duties as a leader in his church)." *Id.* at 851. We agree. To the extent that Defendants refused to provide religious materials or services to Florer and refused to recognize him as Jewish, such determinations were ecclesiastical, not public, functions.

**[8]** Florer relies on *Phelps v. Dunn*, a Sixth Circuit decision that held that a volunteer chaplain was a state actor when, in violation of prison policy, he blocked a homosexual inmate from attending prison chapel services otherwise open to all. 965 F.2d 93, 102 (6th Cir. 1992). But *Phelps* is a case about denial of a prisoner's access to religious congregational services in general. In *Phelps*, the court expressly noted that its decision did not "concern the rights of other prisoners or pastors to have a service without those they may consider sinners." *Id.* at 98. Indeed, the Sixth Circuit noted that "in the absence of quite specific evidence of concrete discrimination on an impermissible ground, federal courts should not become involved in determining questions of selection of lay people for liturgical participation." *Id.* at 101 (distinguishing between "participation" and "attendance"). Moreover, the court grounded its decision that the chaplain was a state actor on the existence of prison policy, and a contract signed by the chaplain, that "specifically restricted him from denying prisoners access to religious services on the basis of his own religious beliefs." *Id.* at 102. The chaplain actively barred the prisoner from attending a religious service in a prison chapel, disregarding the contract, prison policy, and a directive from the Warden requiring that the prisoner "be allowed to participate in religious services and [that he] should not be denied participation because of his sexual orientation." *Id.* at 99. We decline to apply the holding of *Phelps* here because Florer was not barred by Defendants from attending the prison's generally available religious services. While CPSNA had

entered into a contract with DOC to provide religious instruction and guidance to inmates, the contract cannot reasonably be read to require Defendants to provide Florer with a Torah, calendar, or rabbi visit. Defendants are not state actors under the public-function analysis.

**B**

**[9]** Florer also contends that Defendants are state actors under the "joint action" analysis outlined in the Supreme Court's decision in *Lugar*, where the Court held: "Private persons, jointly engaged with state officials in the prohibited action, are acting 'under color' of law." *Lugar*, 457 U.S. at 941 (quoting *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 152 (1970)) (internal quotation marks omitted). "[W]e consider whether 'the state has so far insinuated itself into a position of interdependence with the private entity that it must be recognized as a joint participant in the challenged activity. This occurs when the state knowingly accepts the benefits derived from unconstitutional behavior.' " *Kirtley*, 326 F.3d at 1093 (quoting *Parks Sch. of Bus., Inc. v. Symington*, 51 F.3d 1480, 1486 (9th Cir. 1995)).

**[10]** To support the contention that Defendants were joint participants with the state, Florer points to our decision in *Swift v. Lewis*. 901 F.2d 730, 732 n.2 (9th Cir. 1990). We there held that the state action doctrine did not bar a claim against a private individual who contracted with the state to help determine whether a prison should classify particular prisoners as Sikhs because the private individual "was a 'willful participant in joint action with the State or its agents.' " *Id.* (quoting *Dennis v. Sparks*, 449 U.S. 24, 27-28 (1980)). Florer contends that here, as in *Swift*, the DOC relied on Defendants' determination about which prisoners were Jewish. This argument fails for two reasons. First, in *Swift*, the plaintiff alleged that the private individual conspired with prison officials to remove the plaintiff from the list of Sikh prisoners. *Swift*, 901 F.2d at 732. Here, the record is devoid of any evidence that

Defendants conspired with the DOC or were willful participants in decisions made by the DOC about how to classify Florer.[6] Second, even if Defendants had provided advice to the DOC about Florer's Jewish status, such advice was an ecclesiastical answer to a question of religious doctrine, not an administrative determination. Chaplains and religious leaders do not automatically become state actors when they provide opinions on matters of dogma in response to inquiries from prison officials. "At least insofar as matters of religious theory are implicated . . . prison chaplains enjoy complete protection from the prospect of governmental intrusion, and there is no 'joint effort' between prison officials and the clergy concerning spiritual questions." *Montano*, 120 F.3d at 851 n.11. There is no evidence that the DOC wanted Defendants to determine that Florer was not Jewish, or that the DOC derived any benefit from Defendants' determination. The joint action test is not satisfied absent willful joint participation, like the conspiracy in *Swift*, where the state was in "a position of interdependence with the private entity." *Kirtley*, 326 F.3d at 1093 (quoting *Parks Sch. of Bus., Inc.*, 51 F.3d at 1486).

## VI

[11] We hold that defendants's actions do not present the required "close nexus between the State and the challenged action." *Brentwood Acad.*, 531 U.S. at 295 (quoting *Jackson*, 419 U.S. at 351). Because Florer has not named a state actor, the district court correctly granted summary judgment for Defendants.

---

[6]While Florer does present some evidence to support his contention that the DOC relied on Defendants' input in determining whether *other* prisoners should be classified as Jewish, that evidence is not relevant here because Florer has not presented proof that he was not classified by the DOC as Jewish, or that he was deprived of any prison-provided services or benefits as a result of Defendant's actions.

**AFFIRMED.**