10 F.3d 1340
 Gerald T. GENTRY, Appellant,
v.
LEE'S SUMMIT, MISSOURI, CITY OF; Board of Aldermen of City
of Lee's Summit, Missouri; Karen Moesserli; Kip Scott;
Gary Crenshaw; Chris Patterson; Charles Plank; David
Fletcher; Robert G. Jones, Former Mayor of the City of
Lee's Summit, Missouri; Debra L. Moore, City Attorney of
the City of Lee's Summit, Missouri; D. John Edwards, Former
City Administrator of the City of Lee's Summit, Missouri;
Gregory Henderson, Chief of Police of the City of Lee's
Summit, Missouri; John Does, Several unknown police
officers of the City of Lee's Summit, Missouri, Appellees.
 No. 93-1505.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Sept. 13, 1993.
Decided Dec. 3, 1993.
 
 Donald L. Davis, Kansas City, MO, argued, for appellant.
 Robert O. Jester, Kansas City, MO, argued, for appellee.
 Before WOLLMAN and MORRIS SHEPPARD ARNOLD, Circuit Judges, and GUNN,* District Judge.
 MORRIS SHEPPARD ARNOLD, Circuit Judge.
 
 
 1
 Gerald T. Gentry brought this civil rights action under 42 U.S.C. Sec. 1983 against the City of Lee's Summit, Missouri, ("the City") and several of its officials for seizure of premises that Gentry leased from it, and the trade fixtures within. Gentry now appeals a district court entry of summary judgment in favor of defendants. At issue is whether a government and its officials may be held liable under 42 U.S.C. Sec. 1983 for reentering property leased from it without predeprivation proceedings. We hold that in the circumstances presented here they may and therefore reverse. We set forth hereafter such facts as the record would justify a reasonable juror in finding.
 
 I.
 
 2
 In May of 1989, Gerald Gentry leased a portion of a building from the City for five years. The lease provided that if Gentry defaulted in the performance of his duties under the lease, "and such default continues for ten (10) days after written notice thereof, or if the Property be vacated or abandoned," then the City "may re-enter the Property and take possession thereof, with or without force or legal process and without notice or demand...." Following the execution of the lease, Gentry undertook extensive renovations of the space for the purpose of operating a restaurant and cocktail lounge. He conducted a restaurant business at the location continuously from October 1989 through January 1990. At the end of January of 1990, Gentry closed the restaurant portion of the building for further renovations, while keeping the cocktail area open.
 
 
 3
 On February 1, 1990, Debra L. Moore, the City Attorney, accompanied by several City police officers, forcibly entered the restaurant. When Guy Martin Gentry, the son and employee of the appellant, arrived at the restaurant that morning, he found nine to ten people there, including five to six uniformed Lee's Summit police officers. Ms. Moore asked for the younger Gentry's keys, and informed him that he was not permitted to enter the building. One of the officers told him that if he returned he would be arrested for trespassing. While the son was present, the telephone rang and was answered by one of the police officers. The officer was overheard to say that the restaurant was out of business.
 
 
 4
 "[I]n any Sec. 1983 action the initial inquiry must focus on whether the two essential elements to a Sec. 1983 action are present: (1) whether the conduct complained of was committed by a person acting under color of state law; and (2) whether this conduct deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States." Parratt v. Taylor, 451 U.S. 527, 535, 101 S.Ct. 1908, 1913, 68 L.Ed.2d 420 (1981) (overruled in part not relevant here, by Daniels v. Williams, 474 U.S. 327, 330-331, 106 S.Ct. 662, 664-665, 88 L.Ed.2d 662 (1986)). We address these inquiries in turn.
 
 II.
 A.
 
 5
 "The traditional definition of acting under color of state law requires that the defendant in a Sec. 1983 action have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.' " West v. Atkins, 487 U.S. 42, 49, 108 S.Ct. 2250, 2255, 101 L.Ed.2d 40 (1988) (quoting United States v. Classic, 313 U.S. 299, 326, 61 S.Ct. 1031, 1043, 85 L.Ed. 1368 (1941)). Accord Monroe v. Pape, 365 U.S. 167, 183-187, 81 S.Ct. 473, 482-484, 5 L.Ed.2d 492 (1961) (overruled in part on other grounds, Monell v. New York City Dept. of Social Services, 436 U.S. 658, 695-701, 98 S.Ct. 2018, 2038-2041, 56 L.Ed.2d 611 (1978)). "[S]tate employment is generally sufficient to render the defendant a state actor." West, 487 U.S. at 49, 108 S.Ct. at 2255 (quoting Lugar v. Edmondson Oil Co., 457 U.S. 922, 936, n. 18, 102 S.Ct. 2744, 2753, n. 18, 73 L.Ed.2d 482 (1982)). In West, an inmate had brought a Sec. 1983 action against a private physician under contract with the state of North Carolina to provide services to inmates at a state prison hospital on a part-time basis. The court held that the physician acted under color of state law when treating the inmate's injury. The court reasoned that the fact that the physician was acting on behalf of the state with authority provided by the state made him an agent of the state and, therefore, a state actor. Id. 487 U.S. at 56-57, 108 S.Ct. at 2259-2260.
 
 
 6
 The present dispute provides a much clearer case of state action. Neither Ms. Moore, the city attorney, nor the police officers, would have been present at the seizure of the restaurant but for their respective positions as state officials. They were conducting state (as opposed to, say, personal) business. They are, therefore, more clearly state officials acting on behalf of the state than the physician under contract with the state in West.
 
 
 7
 The City, relying on Polk County v. Dodson, 454 U.S. 312, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981), asserts that the state, when engaged in a proprietary function, is not a state actor for purposes of Sec. 1983. This reliance, however, is misplaced. The Supreme Court held in Polk County that a public defender was not a state actor for purposes of Sec. 1983. The Court, however, based its holding on the fact that the public defender's position obliged him to function as "the State's adversary." Id. 454 U.S. at 323, n. 13, 102 S.Ct. at 452, n. 13. In fact, the Supreme Court has described Polk County as "the only case in which this Court has determined that a person who is employed by the State and who is sued under Sec. 1983 for abusing his position in the performance of his assigned tasks was not acting under color of state law." West, 487 U.S. at 50, 108 S.Ct. at 2256.
 
 
 8
 The "proprietary/traditional function" distinction that the City is attempting to draw had a narrow, brief, but now defunct application in an altogether unrelated area of constitutional law. From 1974 to 1985, the Supreme Court recognized a constitutional immunity enjoyed by the states qua states from regulation by the federal government when the states were engaged in traditional state functions. This immunity did not extend to the states when acting in a "proprietary" capacity. National League of Cities v. Usery, 426 U.S. 833, 845, 96 S.Ct. 2465, 2471, 49 L.Ed.2d 245 (1976). The Supreme Court erased this distinction entirely in Garcia v. San Antonio Metropolitan Transit Authority et al., 469 U.S. 528, 105 S.Ct. 1005, 83 L.Ed.2d 1016 (1985). No similar distinction exists in other areas of constitutional law, and the Supreme Court has clearly articulated a rejection of such a view for purposes of Sec. 1983. See West, 487 U.S. at 49-57, 108 S.Ct. at 2255-2260. Accordingly, we find that the City officials, as employees of the City acting deliberately and in their official capacities, were acting under color of state law for purposes of Sec. 1983.
 
 B.
 
 9
 The second question is whether the state actors deprived a person of rights, privileges, or immunities protected by the Constitution or laws of the United States. A leasehold and the trade fixtures located on it are undoubtedly property rights, but the City claims that Gentry had lost these rights prior to entry by abandoning them.
 
 
 10
 The issue of abandonment is governed by state law. "Abandonment," under the Missouri law of leaseholds, "requires proof of nonuse of the premises with the intention of relinquishing all property rights." Phillips v. Ockel, 609 S.W.2d 228, 233 (Mo.App.1980). "Intention is the first and paramount object of inquiry, for there could be no abandonment without the intention to abandon." Cole County v. Board of Trustees of the Jefferson City Free Library District, 545 S.W.2d 422, 425 (Mo.App.1976). "Such an intention may be inferred only from strong and convincing evidence." Id. Similarly, Missouri courts have defined abandonment, in the law of personal property, as " 'a conscious purpose on the part of the owner of personal property to so treat the same as to manifest an intention to thereafter neither use nor retake it into his possession.' " State of Missouri v. Chevalier, 623 S.W.2d 42, 46 (Mo.App.1981) (quoting St. Louis Dairy Co. v. Northwestern Bottle Co., 204 S.W. 281, 283 (Mo.App.1918)). It is no more sufficient that the City believed that the premises and trade fixtures were abandoned, than had the City driven off with the wrong car in the mistaken belief that it was City property. If Mr. Gentry did not manifest an intention actually to abandon the premises leased and the trade fixtures within, then the City, by way of its agents, took what did not belong to it.
 
 III.
 A.
 
 11
 The City correctly points out that the Fourteenth Amendment does not provide a blanket protection against all deprivations of property by the State. It affords protection only against deprivations occurring without due process of law. To determine what process is due in any particular case, we must weigh several matters:
 
 
 12
 First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.
 
 
 13
 Zinermon v. Burch, 494 U.S. 113, 127, 110 S.Ct. 975, 984, 108 L.Ed.2d 100 (1990) (quoting Mathews v. Eldridge, 424 U.S. 319, 335, 96 S.Ct. 893, 903, 47 L.Ed.2d 18 (1976).
 
 
 14
 In applying the Mathews v. Eldridge balancing analysis, the Supreme Court has generally held that the Due Process Clause requires some kind of a hearing before the state may deprive a person of liberty or property. See Cleveland Board of Education v. Loudermill, 470 U.S. 532, 542, 105 S.Ct. 1487, 1493, 84 L.Ed.2d 494 (1985) (" '[T]he root requirement' is 'that an individual be given an opportunity for a hearing before he is deprived of any significant protected interest' "; hearing required before termination of employment (emphasis in original)); Memphis Light, Gas & Water Div. v. Craft, 436 U.S. 1, 18, 98 S.Ct. 1554, 1565, 56 L.Ed.2d 30 (1978) (hearing required before cutting off utility service); Fuentes v. Shevin, 407 U.S. 67, 80-84, 92 S.Ct. 1983, 1994-1996, 32 L.Ed.2d 556 (1972) (hearing required before issuance of writ allowing repossession of property).
 
 B.
 
 15
 We complete our Sec. 1983 analysis with the application of the principles of Mathews v. Eldridge to the present case. First, in the absence of actual abandonment, the property interests affected by the government's action are substantial. While the Due Process Clause sets no minimum threshold value for which protection begins, each of Gentry's property interests manifestly equals or exceeds those recognized as deserving of Fourteenth Amendment protection. See, e.g. Parratt v. Taylor, 451 U.S. at 536, 101 S.Ct. at 1913 (a hobby kit worth $23.50 falls within the definition of property); Goldberg v. Kelly, 397 U.S. 254, 264, 90 S.Ct. 1011, 1018, 25 L.Ed.2d 287 (1970) (welfare benefits constitute a property interest). If he did not actually abandon the restaurant and everything in it, then Mr. Gentry's private interest is weighty on the scales of Mathews.
 
 
 16
 Second, both "the risk of erroneous deprivation," and "the probable value, if any, of additional or substitute procedural safeguards" are very high. The City gave itself no opportunity to consider information contrary to its conclusions about the state of the premises. Even when confronted by evidence that might be characterized as contrary to the conclusion that the premises were abandoned (e.g., the arrival of the son of the owner shortly after entry, a live telephone line, and an inquiry from a telephoning customer), the City officials insisted on effecting the repossession of the premises. By acting abruptly and summarily, the City gambled that it was correct in its conclusions.
 
 
 17
 The City, relying on Parratt v. Taylor, argues that a postdeprivation procedure is constitutionally sufficient where such procedure adequately compensates an individual for any erroneous deprivation resulting from the government's action. The Supreme Court, however, flatly rejected this position in Zinermon v. Burch. That case involved an action against physicians and administrators of Florida State Hospital for admitting the plaintiff as a "voluntary" mental patient when he was incompetent to give informed consent to his admission. The Court held that a postdeprivation procedure was inadequate to satisfy the requirements of the Constitution under those circumstances. The Court explained that "Parratt is not an exception to the Mathews balancing test, but rather an application of that test to the unusual case in which one of the variables in the Mathews equation--the value of predeprivation safeguards--is negligible in preventing the kind of deprivation at issue." Zinermon, 494 U.S. at 129, 110 S.Ct. at 985. The nature of the mode of deprivation in Parratt--the negligent action of a state employee--made it impossible for the state to provide for a hearing before the event causing the deprivation. "[T]he proper inquiry under Parratt is 'whether the state is in a position to provide for predeprivation process.' " Zinermon, 494 U.S. at 130, 110 S.Ct. at 985 (quoting Hudson v. Palmer, 468 U.S. 517, 534, 104 S.Ct. 3194, 3204, 82 L.Ed.2d 393 (1984). Accordingly, "[i]n situations where the State feasibly can provide a predeprivation hearing before taking property, it generally must do so regardless of the adequacy of a postdeprivation tort remedy to compensate for the taking." Id. 494 U.S. at 132, 110 S.Ct. at 987.
 
 
 18
 In the present case, there is little question that the City could have feasibly resorted to a predeprivation procedure. The City can point to no exigency which demanded its entry of the restaurant on February 1, 1990, without notice and a hearing. In fact, part of that predeprivation procedure (notice) was promised by the City in its lease with Gentry. It stands to reason that if the City promised this much, it must have thought that this much was, at the very least, possible. Not only was predeprivation procedure feasible, but the City had every reason to anticipate the need for it.
 
 
 19
 Some form of notice and opportunity for a hearing in this case might have proven very valuable for both sides. The City need not have resorted to formal state court proceedings. It might, as contemplated by the terms of the lease, have sent a letter of its intentions to Gentry, and given him reasonable time to respond. It might have posted notice on the entrance to the premises, again allowing time for a response before acting. Whether by letter, posting, or telephone call, the City could have provided Gentry with an opportunity to make clear his intentions with regard to the property. The City would have been relieved from the danger of incorrectly construing any ambiguity arising from the condition of the premises. Gentry, on the other hand, would have been protected in the event his actions might have been misinterpreted.
 
 
 20
 Finally, the cost of such notice and response time, which is the subject of the third inquiry required by Mathews, was almost certainly negligible. Without an exigency requiring prompt and sudden action, it is difficult to conceive of how notice and time for a response could burden the City in such a way as to outweigh the substantial private property interests at stake.
 
 IV.
 
 21
 We conclude that the City cannot escape Sec. 1983 liability unless Gentry had no interest for the Constitution to protect. This would be the case only upon a finding that Gentry actually abandoned the leased premises and the trade fixtures in it. This is a material fact that is in dispute and it was therefore error for the district court to have entered summary judgment in the City's favor. Accordingly, we reverse the District Court entry of summary judgment, and remand for further proceedings consistent with this opinion.
 
 
 
 *
 The HONORABLE GEORGE F. GUNN, United States District Judge for the Eastern District of Missouri, sitting by designation