**United States Court of Appeals**
**FOR THE EIGHTH CIRCUIT**

No.  96-2487

_____

Nick P. Montano,                       *
                                       *
          Plaintiff - Appellant,       *
                                       * Appeal from the United States
     v.                                * District Court for the
                                       * Southern District of Iowa.
Paul Hedgepeth; James Helling;         *
Dale Vande Krol,                       *
                                       *
          Defendants -                 *
Appellees.

_____

Submitted:  January 16, 1997

                              Filed:   July 23, 1997

_____

Before WOLLMAN, FLOYD R. GIBSON, and HANSEN, Circuit Judges.

_____

FLOYD R. GIBSON, Circuit Judge.

     Appellant Nicholas P. Montano, an inmate at the Iowa State Penitentiary (the "ISP"), filed this 42 U.S.C. § 1983 action against Dale Vande Krol, a prison chaplain, primarily claiming that the clergyman had excluded Montano from Protestant services in violation of his rights under the First Amendment and the Religious Freedom Restoration Act of 1993 ("RFRA"), 42 U.S.C. §§ 2000bb to 2000bb-4 (1994).  After a bench trial, the district court determined Montano had failed to demonstrate that his inability to attend Protestant services infringed upon his sincerely held religious beliefs.

The court thus entered judgment in favor of Vande Krol,[1] and this appeal followed. Based on our conclusion that a prison chaplain, when performing purely ecclesiastical duties, is not a state actor, we affirm the district court's judgment.

## I. BACKGROUND

Montano, though not Jewish by either birth or conversion, practices a religion known as Messianic Judaism. By his own account, this means that he is "a Christian who studies from a Jewish perspective." Montano embraces many of the fundamental tenets commonly associated with the Christian faith, such as the divinity of Jesus Christ, but he also finds it important to observe traditional Jewish holidays and festivals like Rosh Hashana. Accordingly, while his theology borrows elements from Judaism and Protestant Christianity, it is apparent that he holds views which are offensive to at least some members of both sects. Unable to find acceptance within either of the two denominations which influence his own beliefs, the prisoner filed suit in federal court alleging a violation of his free exercise rights.

At the crux of this dispute lies the fact that Messianic Judaism is not an officially recognized religion at the ISP. As a result, its followers, who are few in number at the prison,[2] do not enjoy all the benefits accompanying that status. For example, the congregations of recognized denominations, including Protestantism, conventional Judaism, and Catholicism, enjoy one hour per week in the prison chapel for religious services, two additional hours of meeting time per week for educational purposes, an institutional financial account, a lockbox in the chapel, and the right to observe holy

---

[1]In addition, the district court dismissed Montano's claims against two other prison officials, Paul Hedgepeth and James Helling. On appeal, Montano does not challenge this aspect of the court's ruling.

[2]At the time of trial, only one ISP prisoner besides Montano regularly practiced Messianic Judaism.

days.  By contrast, adherents of Messianic Judaism, along with followers of other unrecognized faiths, only receive access to a lockbox and one hour per week in the chapel.

Evidently wishing to avail himself of the additional worship time afforded to members of recognized groups, Montano began attending Jewish services at the prison in early 1993.  In March of that year, however, the religious consultant for Judaism, Rabbi Horn, announced that Messianic Judaism is "basically a Christian organization" with teachings "contrary to Judaism."  Accordingly, the rabbi asked Chaplain Vande Krol to prevent Messianic Jews from attending traditional Jewish observances.[3]  Vande Krol acceded to this request and, by memorandum dated March 11, 1993, promulgated a policy which barred from Jewish services all inmates claiming as their religion Messianic Judaism.

A short while later, Montano began attending Protestant celebrations. According to Chaplain Vande Krol, who is himself a Protestant and serves as religious leader for that faith,[4] Montano did not in any way disrupt the ceremonies.  In fact, Montano initially assumed an instrumental role in the observances by leading the singing and taking "a very active part in Christianity for some time."  Before long, however, other

---

[3]Rabbi Horn, an unpaid religious advisor, could not have unilaterally stopped the Messianic Jews from attending Jewish services.  As prison chaplain, Vande Krol, a state employee, has general responsibility for managing the chapel and coordinating the administrative aspects of the various religious events.  Thus, it is Vande Krol who authorizes the passes which allow an individual prisoner to attend gatherings sponsored by that inmate's chosen denomination.  In honoring Rabbi Horn's request, Vande Krol merely discontinued issuing to Messianic Jews passes for conventional Jewish services.

[4]Vande Krol considers himself to be the pastor for the ISP Protestant congregation.  Acting in this capacity, he is no different from the volunteer religious advisors who minister at the prison.

members of the Protestant group approached Vande Krol with concerns about some beliefs Montano had expressed. In particular, these "inmates of the church body" informed Vande Krol that Montano had advised other prisoners that salvation is possible other than through Jesus Christ, that the Bible in its current form is improperly translated, and that a person must study Jewish background and culture to properly understand the scripture.

Montano's propagation of these views, which Vande Krol deemed to be "false doctrine," prompted the chaplain to convene a meeting of "mature Christian brothers" to decide whether Montano should continue attending Protestant functions.[5] Vande Krol invited certain individuals, including the congregation's democratically elected elders, to discuss Montano's activities, and he refused Montano's entreaties to allow others to attend. At the conclusion of the gathering, during which the participants had an opportunity to personally question Montano about his beliefs, those assembled decided to preclude Montano from participating in Protestant events for one year. Everyone at the meeting, with the exception of one inmate, signed a letter informing Montano and other Protestants of the chosen course of action. The document, which Vande Krol wrote, indicated that Montano would be permitted to rejoin the "Body of Christ" only when he displayed a "true repentance."[6]

---

[5]For those denominations outside Vande Krol's own realm of expertise, such as conventional Judaism, the chaplain will remove an inmate from a particular group only upon the advice of the faith's religious advisor. Because Vande Krol is the Protestant coordinator, it was up to him to decide the proper action to be taken vis-a-vis Montano.

[6]The body of the memorandum reads as follows:

TO THE CHRISTIAN BODY AT ISP:

On Nov[ember] 15, 1994 a meeting of appointed Christian brothers met with Nick Montano to hear the following charges:

> That Nick Montano has been instrumental in spreading a false doctrine in the Church; that he has damaged the unity of the Body of Christ; that he has done damage to the witness of Christ to unsaved; and that he is continuing in a spirit of divisiveness and unrepentence.

Montano then attempted, unsuccessfully, to gain readmittance to the Protestant services by more fully explaining his predicament, via "inmate memoranda," to Vande Krol and James Helling, ISP's treatment director. What eluded Montano's own zealous efforts, however, was attained through the inexorable passage of time. Toward the close of his year of excommunication, Montano received a notice from Vande Krol extending to him "the opportunity to reunite with the Christian Body and to participate in corporate worship services."[7] Nonetheless, because his personal beliefs remained

---

From the meeting, it was decided by the gathering that Nick Montano was deceptive and confusing in his answers, that he had been disruptive to the unity of the Body of Christ by his teachings and actions, and had been (and is) unrepentive of his actions.

It is therefore the conclusion of the group that Nick Montano needs to be removed from the Body of Christ for one year. The purpose and goal of this decision is to 1) emphasize the gravity of his teaching and action, and 2) to hope that Nick will show forth a true repentance so that he may be re-united [sic] with the Church.

It needs to also be stated that this gathering does not wish to discourage indept [sic] studies or individually held doctrinal beliefs. However, when that belief structure is lived out in such a way as to mislead other Christians or create disunity, th[e]n that behavior forces the Body of Christ to discipline its membership.

App. at 9.

[7]With regard to the result desired to be accomplished by the imposed discipline, Vande Krol wrote, "Only God knows to what ext[ent] this goal has been reached, and we leave that determination also up to Him."

unaltered, and fearing swift discipline should he choose to rejoin the Protestant group, Montano declined this invitation and instead filed the instant suit in the United States District Court for the Southern District of Iowa.  As relevant to this appeal, Montano's pro se Complaint alleged that Vande Krol violated his constitutional and statutory[8] free exercise rights by excluding him from Protestant activities.  Though the district court found, over the State's protestations, that Vande Krol's conduct amounted to state action, it decided that the chaplain had not trammeled upon Montano's right to freely exercise his religion.  In so holding, the court relied upon the fact that Montano does not claim to be either Jewish or Protestant.  As such, the prison did not burden his religious expression when it prohibited him from attending services conducted by those faiths.  To the contrary, the ISP reasonably attempted to accommodate Montano's rather unique beliefs by affording Messianic Jews a lockbox and weekly time in the chapel.

On appeal, Montano takes issue solely with the district court's decision that Vande Krol did not violate Montano's federally protected rights when the chaplain banned him from Protestant events.  After lengthy and careful consideration of the record and the relevant authorities, we have resolved that Vande Krol did not act on behalf of the state when he excluded Montano from the Protestant services.  Consequently, we affirm the district court's judgment in favor of Vande Krol.

---

[8]On June 25, 1997, the United States Supreme Court held that RFRA represents an unconstitutional extension of Congress's legislative authority under Section Five of the Fourteenth Amendment.  See City of Boerne v. Flores, 65 U.S.L.W. 4612, 4620 (U.S. June 25, 1997) ("Broad as the power of Congress is under the Enforcement Clause of the Fourteenth Amendment, RFRA contradicts vital principles necessary to maintain separation of powers and the federal balance.").  It follows, then, that Montano's RFRA claim no longer states a viable cause of action.

## II. DISCUSSION

A bulwark for individual liberties, 42 U.S.C. § 1983 provides legal redress to individuals who suffer violations of their federal rights at the hands of any "person" who acts "under color" of state law. 42 U.S.C. § 1983 (1994). That being so, a § 1983 plaintiff can prevail only if he proves he has been subjected to a deprivation of "rights, privileges, or immunities secured by the Constitution or laws of the United States." Comiskey v. JFTJ Corp., 989 F.2d 1007, 1010 (8th Cir. 1993) (quotation omitted). And, naturally, the challenged conduct must have been committed by one who acts "under color of state law." Id. Presently, Montano contends that Chaplain Vande Krol infringed upon his First Amendment prerogative to freely exercise his religion. Like most other constitutional provisions, however, the First Amendment, which is binding on the states by virtue of the Fourteenth Amendment's Due Process Clause, see United Bhd. of Carpenters, Local 610 v. Scott, 463 U.S. 825, 831 (1983), erects a shield exclusively against governmental misconduct, see id. It provides no protection against private behavior, no matter how egregious. Consequently, this deceptively complex appeal requires us to apply the confused and confusing concepts attendant to the state action analysis.

In ascertaining the presence of state action, we must examine the record to determine whether "the conduct allegedly causing the deprivation of a federal right [is] fairly attributable to the State." Lugar v. Edmondson Oil Co., 457 U.S. 922, 937 (1982). Resolving this question entails a journey down a particularly fact-bound path, see id. at 939, but the Supreme Court has identified two legal touchstones to provide guidance along the way. To begin with, there can be no "fair attribution" unless the alleged constitutional violation was "caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the State or by a person for whom the State is responsible." Id. at 937. Furthermore, "the party charged with the deprivation must be a person who may fairly be said to be a state actor. This may be because he is a state official, because he has acted together with or has obtained

-7-

significant aid from state officials, or because his conduct is otherwise chargeable to the State."  Id.; see also Roudybush v. Zabel, 813 F.2d 173, 176-77 (8th Cir. 1987) (repeating two part test).

These two distinct, but related, components of the fair attribution test ordinarily "collapse into each other when the claim of a constitutional deprivation is directed against a party whose official character is such as to lend the weight of the State to his decisions." Lugar, 457 U.S. at 937.  It is not especially surprising, then, that federal courts, including our own, have consistently held that "state employment is generally sufficient to render the defendant a state actor." Id. at 936 n.18; see also Gentry v. City of Lee's Summit, Missouri, 10 F.3d 1340, 1342 (8th Cir. 1993).  Were the correlation between public employment and state action absolute, our task would be an easy one, for there can be no doubt that Chaplain Vande Krol is a state employee.  As it happens, though, the association of these two concepts, while assuredly strong, is less than perfect.  See Polk County v. Dodson, 454 U.S. 312, 324 (1981) (concluding that state cannot be deemed responsible for acts committed by a public defender when "exercising her independent professional judgment in a criminal proceeding"); cf. Meeker v. Kercher, 782 F.2d 153, 155 (10th Cir. 1986) (extending Polk County to situation involving guardian ad litum).  Thus, even when an officer of the state is named as a defendant in a § 1983 lawsuit, we must refrain from automatically assuming the existence of state action.  Instead, we must stay focused upon the underlying concern which governs our analysis in all cases such as this: whether the conduct at issue is "fairly attributable" to the state.

Within this legal context, we find the Supreme Court's opinion in Polk County to be profoundly instructive.  In concluding that a public defender does not act "under color of state law" while providing representation to an indigent criminal defendant,[9]

---

[9]The analysis in Polk County concentrated on whether a public defender acts under color of state law for purposes of § 1983.  See Polk County, 454 U.S. at 322 n.12.  Less than one year later, in Lugar, the Court clarified that the state action and color of state law questions are, for most practical purposes, identical.  See Lugar, 457 U.S. at 935.  To the extent that the "under color of state law" requirement might theoretically encompass conduct that would not qualify as state action, cf. id. at 935 n.18, this exigency is currently irrelevant.  Therefore, in keeping with this Court's normal practice, we sometimes use the terms interchangeably in this opinion.

the Court emphasized that the job is marked by "functions and obligations in no way dependent on state authority." Polk County, 454 U.S. at 318. Utilizing this functional approach, the Court explained that the public defender's employment status was not in itself adequate to establish the degree of governmental participation necessary to support a viable § 1983 cause of action. See id. at 321. That the defendant was on the state's payroll was "certainly a relevant factor" in the color of law equation, but its persuasive force was overcome by two important attributes which characterize the position in question. See id. First of all, because an attorney's overriding obligation requires him to make decisions grounded in his client's best interests, a public defender is not, and cannot be, subject to the same degree of administrative supervision as other governmental employees. See id. Rather, "a public defender works under canons of professional responsibility that mandate his exercise of independent judgment on behalf of the client." Id. Second, the Court found it significant that the state is obliged, under the Sixth and Fourteenth Amendments to the Constitution, to respect the professional independence of a public defender. See id. at 321-22. This ensures that the representation provided to one charged with a crime will be "free of state control." Id. at 322. Therefore, unlike most persons who work for the government, a public defender operates within a sphere of independence allowing him to function not as the state's emissary, but as its opponent. See id. at 319-22. Under these circumstances, the Court held that a public defender does not act under color of state law when "exercising her independent professional judgment in a criminal proceeding." Id. at 324.

Since issuing its opinion in Polk County, the Supreme Court has made it abundantly clear that the case does not remove all professionals from the reach of § 1983; to the contrary, professionals in the state's employ can, and regularly will, qualify as state actors. See West v. Atkins, 487 U.S. 42, 51-52 (1988). In West, the Court reaffirmed that a prison doctor doubles as a state actor when engaging in the medical treatment of inmates. See id. at 54. The Court stressed that a physician, albeit ethically bound to make independent medical judgments on behalf of his patients, cannot properly be likened to a public defender. See id. at 51-52. The key difference between the two posts is that a prison doctor, as distinguished from a defense attorney, does not face the state as an adversary; rather, the health care afforded to inmates is a result of "close cooperation" and a "joint effort" between medical professionals and correctional administrators. See id. at 51. Consequently, physicians working in state prisons, who help to fulfill the state's Eighth Amendment obligation to inmates and who typically are the only health professionals available to care for incarcerated persons, are persons who may fairly be said to be state actors. See id. at 54-55.

We are now confronted with the applicability of Polk County to another class of professionals, the clergy. In attempting to discern whether ministers who are members of a prison staff should for all purposes be considered state actors, we have taken heed of the reality that Polk County "is the only case in which th[e Supreme] Court has determined that a person who is employed by the State and who is sued under § 1983 for abusing his position in the performance of his assigned tasks was not acting under color of state law." West, 487 U.S. at 50. We are also mindful that subsequent decisions have in no uncertain terms limited the potential scope of Polk County. See id. at 50-52; Gentry, 10 F.3d at 1342-43. Nonetheless, Polk County has neither been reversed outright nor expressly limited to its facts, and we believe the reasoning contained in that decision provides valuable insight to the proper resolution of the dispute currently before us.

-10-

Applying the functional view of state action announced in <u>Polk County</u> and endorsed by subsequent courts, <u>see, e.g.</u>, <u>Georgia v. McCollum</u>, 505 U.S. 42, 54 (1992) ("[T]he determination whether a public defender is a state actor for a particular purpose depends on the nature and context of the function he is performing."), we do not think that the state can be held accountable for conduct undertaken by a prison chaplain acting purely in a clerical capacity. Just as a public defender performs many functions which are free from the shackles of state control, a prison chaplain, although a state employee, sometimes behaves in ways which are beyond the bounds of governmental authority. In matters of faith, a pastor, probably even more so than an attorney acting on behalf of a client, is not answerable to an administrative supervisor. The teachings endorsed and practiced by recognized spiritual leaders are not, and should not be, subject to governmental pressures, and the canons which underlie most of the world's denominations are typically thought to derive from divine, rather than worldly, inspiration. As was the case in <u>Polk County</u>, this independence is memorialized in our Constitution. It is hard to imagine any greater affront to the First Amendment than a state's attempt to influence a prison chaplain's interpretation and application of religious dogma.[10] During the course of his employment, a prison chaplain might, among many other things, deliver sermons, take confessions, grant forgiveness for sins, and counsel inmates on the proper reading of sacred texts. It is

---

[10]Indeed, states might commit a technical violation of the Establishment Clause by even hiring prison chaplains. Nonetheless, this is condoned as a permissible accommodation for persons whose free exercise rights would otherwise suffer. <u>See School Dist. v. Schempp</u>, 374 U.S. 203, 296-98 (1963) (Brennan, J., concurring); <u>Johnson-Bey v. Lane</u>, 863 F.2d 1308, 1312 (7th Cir. 1988); <u>Florey v. Sioux Falls Sch. Dist. 49-5</u>, 619 F.2d 1311, 1329 & n.6 (8th Cir.)(McMillian, J., dissenting), <u>cert. denied</u>, 449 U.S. 987 (1980). Having made religious leaders available to inmates, however, a state cannot "advanc[e] religion through indoctrination." <u>Agostini v. Felton</u>, 65 U.S.L.W. 4524, 4530 (U.S. June 23, 1997). As a consequence, the state cannot compel or even encourage inmates' attendance at religious services, and it most certainly cannot attempt to influence the religious messages which the chaplains convey to the prisoners.

peculiarly difficult to detect any color of state law in such activities. Cf. Polk County, 454 U.S. at 320 (finding it "peculiarly difficult" to detect color of state law in various activities undertaken by a public defender).

The case before us is illustrative of these points. Concerned that Montano was spreading a false doctrine that might have a negative influence on "new or less mature Christians," Chaplain Vande Krol, in his role as the head of the prison's Protestant congregation, convened a meeting of "mature Christian brothers" to determine what, if any, disciplinary action might be appropriate. Upon deliberation, the group, with Vande Krol's approval, decided to excommunicate Montano for one year in order to "emphasize the gravity of [Montano's] teaching and action" and to induce a "true repentance." In our nation, this is simply not the type of decision it falls upon the government to make.[11] Absent any showing that Vande Krol relied upon religious doctrine as a subterfuge and deceptively used the excommunication process to impose

---

[11]A situation involving a prison chaplain lies somewhere between the adversarial relationship which is the lynchpin of a public defender's association with the state, see Polk County, 454 U.S. at 318-20, and the spirit of cooperation in which prison physicians make decisions affecting an inmate's medical treatment, see West, 487 U.S. at 51. At least insofar as matters of religious theory are implicated, however, prison chaplains enjoy complete protection from the prospect of governmental intrusion, and there is no "joint effort" between prison officials and the clergy concerning spiritual questions. Cf. West, 487 U.S. at 51 (noting "joint effort" between medical personnel and other prison officials on health care matters). Given a prison chaplain's constitutionally mandated independence on matters of doctrinal significance, we find this case to be more akin to Polk County than to West. Cf., e.g., West, 487 U.S. at 56 n.15 (noting that financial resources and security measures can have a significant impact on the provision of medical services in prisons).

the will of prison administrators,[12] we cannot say that the expulsion of Montano from the Protestant group is fairly attributable to the state.

In sum, we conclude that a prison chaplain, even if a full-time state employee, is not a state actor when he engages in inherently ecclesiastical functions (that is, when he performs spiritual duties as a leader in his church).[13] By disciplining Montano as a result of the prisoner's perceived transgression of church law, Vande Krol irrefutably acted in his capacity as pastor for the Protestant congregation. In contrast to the administrative and managerial tasks Vande Krol is required to perform as prison chaplain, which clearly would be fairly attributable to the state, see Polk County, 454 U.S. at 324-25 (observing that a public defender may act under color of state law when performing administrative duties), interpretation and implementation of church doctrine

---

[12]Montano apparently concedes that Vande Krol's action was spiritual in nature, and he has not demonstrated that the chaplain's "private" decision should be declared state action through any of the methods normally available to effect that conversion. See Lugar, 457 U.S. at 939 (reciting ways in which private conduct might be deemed state action).

[13]We realize that this conclusion seems to conflict with an opinion from the Sixth Circuit. See Phelps v. Dunn, 965 F.2d 93, 101-02 (6th Cir. 1992). In Phelps, the court reversed a district court's entry of summary judgment for various prison officials, stating that a trial was necessary to determine whether an inmate had actually been denied attendance at worship services and, if so, whether security concerns justified his exclusion. Id. at 99-101. At the close of its decision, the court expressed its view that a volunteer chaplain at the prison was a state actor. See id. at 101-02. The court did not even refer to Polk County, however, and it placed much reliance on the fact that the pastor had signed a contract with the prison which precluded him from denying prisoners access to services based on "his own religious beliefs." Id. at 102. It was only "under th[o]se factual circumstances," id. at 102, which involved the alleged misapplication of an institutional rule and which have not been shown to exist in this case, that the Sixth Circuit found state action.

do not constitute state action.  As a result, Montano has failed to state a justiciable cause of action under § 1983.[14]

## III.  CONCLUSION

We conclude that Chaplain Vande Krol's decision, premised solely on religious grounds, to excommunicate Montano for one year is not conduct that can be fairly attributed to the state.  Accordingly, Montano has not established the state action necessary to substantiate the alleged violation of his First Amendment rights.  We therefore affirm the district court's judgment in favor of Vande Krol.

AFFIRMED.

A true copy.


Attest:


CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.

---

[14]A separate line of decisions from our Court buttresses this result.  In a series of cases, we have noted that "an application of religious doctrine by a recognized spiritual leader of the relevant faith . . . is beyond the constitutional power of the civil courts to review."  Bear v. Nix, 977 F.2d 1291, 1294 (8th Cir. 1992); Scharon v. St. Luke's Episcopal Presbyterian Hosps., 929 F.2d 360, 363 (8th Cir. 1991).  These cases offer inferential support for our decision to affirm the district court.

-14-