**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

DENNIS FLORER,
                     *Plaintiff-Appellant,*

                    v.

CONGREGATION PIDYON SHEVUYIM,
N.A. Contract Chaplaincy; GARY
FRIEDMAN, Contract Chaplain;
JEWISH PRISONERS SERVICES
INTERNATIONAL, Contract
Chaplaincy,
                     *Defendants-Appellees.*

No. 07-35866

D.C. No.
CV-06-01465-RSM

OPINION

Appeal from the United States District Court
for the Western District of Washington
Ricardo S. Martinez, District Judge, Presiding

Argued and Submitted
December 9, 2009—Seattle, Washington

Filed May 5, 2010

Before: Robert R. Beezer, Ronald M. Gould and
Richard C. Tallman, Circuit Judges.

Opinion by Judge Gould

## COUNSEL

Ian Cairns (argued), Theresa DeMonte, and Alysha Yagoda (argued), law students at the University of Washington Law School, Seattle, Washington; supervised by Eric Schnapper, University of Washington Law School, Seattle, Washington, and Leonard J. Feldman, Stoel Rives LLP, Seattle, Washington, for the plaintiff-appellant.

Robert M. McKenna, Washington Attorney General; Sara J. Olson (argued), Assistant Washington Attorney General; and Andrew D. Tsoming (intern), Olympia, Washington, for the defendants-appellees.

## OPINION

GOULD, Circuit Judge:

Dennis Florer, a Washington State prisoner, appeals the district court's summary judgment in Florer's 42 U.S.C. § 1983 and Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA") action against Congregation Shevuyim, N.A., a Jewish organization that contracted with the prison to provide Jewish religious services to prisoners; Jewish Prisoners Services International, an outreach program of the congregation; and Gary Friedman, president of the congregation and chairman of Jewish Prisoners Services International (collectively "Congregation"). Florer alleged that the defendants improperly denied or substantially burdened his access to Jewish religious materials and services. The district court granted summary judgment for the appellees, conclud-

ing that they were not liable because they were private parties who did not act under color of state law. We have jurisdiction pursuant to 28 U.S.C. § 1291. Because we conclude, viewing the evidence in the light most favorable to Florer, that these private parties acted under color of state law, we reverse the district court and remand for further proceedings not inconsistent with this opinion.

# I

Congregation Pidyon Shevuyim, N.A., through its president, Gary Friedman, contracted with the Washington Department of Corrections ("DOC") to provide Jewish religious services to prisoners through an outreach program called Jewish Prisoners Services International. The contract required that Congregation provide "religious training on essential Jewish religious practices to Department of Corrections' offenders who request this service. The services will include religious instruction and assistance with Jewish problems in all prisons located in Washington State." Later, the parties amended this provision by adding, "Services will be open to all offenders, however, the Jewish authorities will determine who can participate in liturgical related activities."

The contract required that Congregation comply with DOC policies as well as the contract's General Terms and Conditions. In particular, DOC Policy Directive 560.200 recognized that prisoners have "inherent and constitutionally protected rights . . . to believe, express, and exercise the religion of their individual choice." It also stated that prisoners should have reasonable access to religious activities and religious instruction, including access to printed materials of a religious nature. Policy Directive 560.200 provided that prisoners may possess religious materials if they, among other things, request those materials "through the facility Chaplain."

DOC Policy Directive 560.100 stated that contract chaplains, such as Congregation, "are expected to attend to the

spiritual needs of offenders for their specific denomination or religious group by performing [several listed] functions," including providing spiritual guidance to offenders as requested. It also required that contract chaplains "[a]dvise [the] facility Chaplain about spiritual, moral, and social concerns of offenders" and "[w]ork under the guidance and supervision of the facility Chaplain."

In 2002, Congregation President Friedman sent a letter to a DOC facility chaplain responding to an inquiry about non-Jewish prisoners participating in Jewish activities and possessing Jewish religious items. The letter explained that the DOC chaplains had been "somewhat lenient" about allowing non-Jewish prisoners to participate in Jewish activities, and Friedman noted an increase in prisoner legal challenges to the receipt of Jewish materials and food. Friedman stated in the letter that "Jewish law" mandates that a person is Jewish only if that person was born to a Jewish mother or formally converted to the faith. Allowing non-Jewish prisoners to participate in Jewish activities, Friedman explained, presented challenges to the orderly operation of correctional facilities and created undue burdens on the Jewish chaplaincy programs. Friedman suggested in the letter that the sole solution was to provide religious materials and services only to those prisoners who "require them as obligations of their bona fide faiths," that is, to prisoners that were born to a Jewish mother or formally converted. Friedman offered to assist the DOC if it had "difficulty in determining which inmates are Jewish."[1]

According to Florer, three months after receiving the letter, the DOC implemented a new policy stating that while "the Department and its agent will not attempt to evaluate the [religious] sincerity of the offender or the religious tradition," it may request "[v]erification from the Clergy of the specified

---

[1]Friedman wrote the letter on DOC letterhead and identified himself in the letter as a "DOC Jewish Chaplain," but he noted that much of the contents were his personal opinion.

religious denomination" before allowing prisoners to participate in religious activities or possess religious materials. Florer also asserted that Congregation thereafter determined whether the prisoners were Jewish according to Congregation's understanding of Jewish law and that the DOC adopted Congregation's determinations.

Florer completed a DOC religious-preference form identifying his religious preference as Jewish and requested a kosher diet, a Torah, a Jewish calendar, and consultation with a rabbi. The facility chaplain referred his requests to Congregation. Florer thereafter sent several letters to Congregation complaining about his kosher diet, asking for assistance to obtain a Torah, and seeking consultation with a rabbi. Florer declared that on at least one occasion he telephoned Friedman and requested a Torah and a Jewish calendar. Florer also declared that Friedman said he would provide Florer with those items if Friedman first determined that Florer was actually Jewish. Friedman admitted that he asked Florer if Florer was born Jewish or formally converted, and Friedman mailed to Florer a questionnaire to assist in this determination. Florer did not complete the questionnaire, and he did not receive the requested religious materials or services.

After exhausting his administrative remedies, Florer filed a pro se complaint in the district court alleging that Congregation violated his First Amendment rights as well as the RLUIPA, 42 U.S.C. § 2000cc, by refusing to provide him access to Jewish religious materials and instruction.

Congregation filed a motion to dismiss for, among other things, failure to name a state actor, and the court converted that motion into a motion for summary judgment. Florer also moved for summary judgment. The district court adopted the magistrate judge's recommendation to grant summary judgment in favor of Congregation. The district court held that even though Florer presented evidence that the DOC relied on Congregation's input in determining whether prisoners should

be classified as Jewish, Congregation was not a state actor. The district court held that Congregation's decision not to provide religious materials to Florer could not be attributable to the state, that the evidence did not support a conclusion that there was joint activity between the DOC and Congregation, and that the Eighth Circuit's reasoning in *Montano v. Hedgepeth*, 120 F.3d 844 (8th Cir. 1997), suggested that because Congregation's conduct involved inherently ecclesiastical functions, that conduct could not be fairly attributable to the state. Florer timely appealed the district court's judgment.

## II

We review de novo a district court's decision to grant summary judgment. *FTC v. Stefanchik*, 559 F.3d 924, 927 (9th Cir. 2009). Our review is governed by the same standard used by the trial court under Federal Rule of Civil Procedure 56(c). *Suzuki Motor Corp. v. Consumers Union, Inc.*, 330 F.3d 1110, 1131 (9th Cir. 2003). We must determine, viewing the evidence in the light most favorable to Florer, whether there are any genuine issues of material fact and whether the district court correctly applied the substantive law. *Olsen v. Idaho State Bd. of Med.*, 363 F.3d 916, 922 (9th Cir. 2004).

We decide the limited issue of whether Congregation acted under color of state law, the sole issue upon which the district court grounded its decision.

## III

[1] To state a claim under 42 U.S.C. § 1983, a plaintiff must show in part that the defendant acted under color of state law.[2] *Gritchen v. Collier*, 254 F.3d 807, 812 (9th Cir. 2001). Similarly, a plaintiff in an RLUIPA action must show that the

---

[2]"Conduct that is actionable under the Fourteenth Amendment as State action is also action under color of State law supporting a suit under § 1983." *Lee v. Katz*, 276 F.3d 550, 554 (9th Cir. 2002).

"government" has imposed a substantial burden on the plaintiff's religious exercise. 42 U.S.C. § 2000cc-1(a). The term "government" is defined, in part, as "any other person acting under color of state law." *Id.* § 2000cc-5(4)(A)(iii).

**[2]** This case involves a special set of considerations that impact whether a private party has acted under color of state law. To determine whether a private actor acts under color of state law, we must evaluate whether the alleged infringement of federal rights is "fairly attributable" to the government even though committed by private actors. *Kirtley v. Rainey*, 326 F.3d 1088, 1092 (9th Cir. 2003); *see also West v. Atkins*, 487 U.S. 42, 49 (1988) ("To constitute state action, the deprivation must be caused by the exercise of some right or privilege created by the State or by a person for whom the State is responsible, and the party charged with the deprivation must be a person who may fairly be said to be a state actor." (internal punctuation omitted)). Determining what is fairly attributable to the government "is a matter of normative judgment, and the criteria lack rigid simplicity. . . . [N]o one fact can function as a necessary condition across the board for finding state action; nor is any set of circumstances absolutely sufficient, for there may be some countervailing reason against attributing activity to the government." *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295-96 (2001). There must be "such a close nexus between the State and the challenged action that seemingly private behavior may be fairly treated as that of the State itself." *Id.* at 295 (internal quotation marks omitted); *see also Single Moms, Inc. v. Mont. Power Co.*, 331 F.3d 743, 747 (9th Cir. 2003).

**[3]** "Because of the fact-intensive nature of the inquiry, courts have developed a variety of approaches" to assess whether a private party has acted under color of state law. *Lee v. Katz*, 276 F.3d 550, 554 (9th Cir. 2002). We have recognized at least four such criteria, or tests: (1) public function, (2) joint action, (3) governmental compulsion or coercion, and

(4) governmental nexus. *Kirtley*, 326 F.3d at 1092; *Sutton v. Providence St. Joseph Med. Ctr.*, 192 F.3d 826, 835-36 (9th Cir. 1999). There is no precise formula for determining whether a private party is a state actor, but the decisions stress the need for a close nexus between the state and the challenged conduct. *See Brentwood*, 531 U.S. at 295. The established criteria are helpful in determining the significance of state involvement, and "[s]atisfaction of any one test is sufficient to find state action, so long as no countervailing factor exists." *Kirtley*, 326 F.3d at 1092.

## IV

**[4]** Under the "public function" analysis, state action is present "in the exercise by a private entity of powers traditionally exclusively reserved to the State." *Caviness v. Horizon Cmty. Learning Ctr., Inc.*, 590 F.3d 806, 814 (9th Cir. 2010) (quoting *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 352 (1974)). For example, in *West v. Atkins*, the Supreme Court held that a private physician acted under color of state law when the physician contracted with the state to provide medical services to prisoners at state-prison hospitals. 487 U.S. at 54. A prisoner filed a civil-rights action against such a physician alleging that the physician violated the prisoner's Eighth Amendment rights by failing to provide necessary medical treatment. *Id.* at 45. The Court held that the physician's conduct could "fairly be attributed to the State" because the state "bore an affirmative obligation to provide adequate medical care to [the prisoner]; the State delegated that function to respondent [physician]; and respondent voluntarily assumed that obligation by contract." *Id.* at 55-56. The Court found significant the prison's policy prohibiting the prisoner from employing or electing "to see a different physician of his own choosing." *Id.* at 44. The Court held, "Contracting out prison medical care does not relieve the State of its constitutional duty to provide adequate medical treatment to those in its custody, and it does not deprive the State's pris-

oners of the means to vindicate their Eighth Amendment rights." *Id.* at 56; *see also, e.g.*, *Lee*, 276 F.3d at 554-55.

**[5]** We conclude, viewing the evidence in the light most favorable to Florer, that the DOC used contract chaplains such as Congregation to meet its legal obligation to provide prisoners with appropriate access to religious materials and services similarly as the state in *West* used contract physicians to meet its obligation to provide adequate medical care to prisoners. "Under the Constitution, reasonable opportunities must be afforded to all prisoners to exercise the religious freedom guaranteed by the First and Fourteenth Amendments." *Pierce v. County of Orange*, 526 F.3d 1190, 1209 (9th Cir. 2008) (quotation marks omitted); *see also Alvarez v. Hill*, 518 F.3d 1152, 1156 (9th Cir. 2008) ("RLUIPA disallows policies that impose a substantial burden on religious exercise unless the burden furthers a compelling governmental interest, and does so by the least restrictive means." (internal punctuation omitted)). The DOC promulgated policies to effectuate these prisoner rights by, for example, permitting prisoners to attend services, celebrate holidays, eat religious diets, receive religious instruction, and possess religious materials. And the DOC employed Congregation to facilitate those policies for Jewish prisoners. Because DOC policy did not permit Florer to have access to Jewish materials and services from other sources without Congregation's approval, and because DOC policy required that Florer request those materials through the facility chaplain, who relied exclusively on Congregation's voluntarily offered determination that Florer was not Jewish, Congregation assumed the DOC's obligation and maintained control over Florer's access to Jewish materials and services. Congregation therefore acted under color of state law.

Our conclusion is consistent with the decision of the Sixth Circuit in *Phelps v. Dunn*, 965 F.2d 93 (6th Cir. 1992). In *Phelps*, the court concluded that a volunteer chaplain acted under color of state law when he excluded a prisoner from attending chapel because the prisoner's homosexual behavior

was contrary to the chaplain's religious beliefs. *Id.* at 102. The court explained that the chaplain's "right to conduct services in the prison chapel was a privilege created by the state" and the chaplain "had signed an agreement that specifically restricted him from denying prisoners access to religious services on the basis of his own religious beliefs." *Id.* The court concluded that there was "something more" than mere action pursuant to governmental authority and remanded to the district court to address the merits of the prisoner's § 1983 claim against the chaplain. *Id.* (quoting *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 939 (1982)).

**[6]** Likewise, Congregation's role in determining which prisoners were Jewish, according to Congregation's religious beliefs, arose through its contract with the DOC. Although the mere fact of a contract with the DOC does not create state action in a contracting party, here the substance of the agreement placed critical responsibilities to facilitate the free exercise of religion by inmates upon Congregation. Congregation agreed to provide Jewish religious services to all prisoners who requested the services and agreed not to deny services on the basis of religion under the contract's General Terms and Conditions. Just as the "purpose of having and regulating prison religious services" in *Phelps* was, as the prison regulations stated, to "ensure the constitutional right of inmates to practice their religion," 965 F.3d at 102, so too was the DOC's purpose of hiring contract chaplains to accommodate the "inherent and constitutionally protected rights [of prisoners] . . . to believe, express, and exercise the religion of their individual choice." *See* DOC Policy Directive 560.200. Contract chaplains were required to attend to the spiritual needs of the offender, to advise the DOC facility chaplain "about spiritual, moral, and social concerns of offenders," and to work "under the guidance and supervision" of the facility chaplain. DOC Policy Directive 560.100. Congregation's determination of whether Florer was Jewish under "Jewish law" controlled Florer's access to Jewish religious materials and services from all Jewish organizations, and, as in *Phelps*,

Congregation acted under color of state law because the DOC contracted with Congregation to meets its duty to provide access to religious materials and services.

[7] The Eighth Circuit's decision in *Montano* is not inconsistent with our conclusion. The court in *Montano* concluded that "a prison chaplain, even if a full-time state employee, is not a state actor when he engages in inherently ecclesiastical functions (that is, when he performs spiritual duties as a leader in his church)." 120 F.3d at 851. But the court recognized that religious actors do not always perform spiritual duties and sometimes may perform duties to fulfill state obligations. *Id.* We agree with the Eighth Circuit that a situation involving a prison chaplain lies somewhere between the adversarial relationship that is the "lynchpin of a public defender's association with the state, *see Polk County* [*v. Dodson*, 454 U.S. 312, 318-20 (1981)], and the spirit of cooperation in which prison physicians make decisions affecting an inmate's medical treatment, *see West*, 487 U.S. at 51." *See Montano*, 120 F.3d at 851 n.11.

The state's nondelegable duty to give prisoners reasonable access to religious materials and services cannot be entirely avoided merely by classifying as "ecclesiastical" the pertinent decisions in providing such access. We conclude that the particular facts of this case, unlike those in *Montano*, make it more consistent with the decision in *West*. Whereas Florer alleged that he could not access any Jewish religious materials and services—even from other Jewish organizations—without Congregation's approval, the prisoner in *Montano* was not so prohibited. *See id.* at 848. Unlike the plaintiff in *Montano*, Florer did not concede that Congregation's actions were spiritual in nature. *See id.* at 851 n.12. In addition, the court in *Montano* distinguished its decision from the Sixth Circuit's decision in *Phelps* because in *Phelps*, the court "placed much reliance on the fact that the pastor had signed a contract with the prison which precluded him from denying prisoners access to services based on his own religious beliefs." *See id.*

at 851 n.13 (quotation marks omitted). Those factual circumstances "ha[d] not been shown to exist in [*Montano*]." *Id.* Here, however, there is a genuine issue of material fact whether the contractual obligation between Congregation and the DOC created circumstances similar to those in *Phelps*.

When a religious entity works with a prison system, the religious entity lies nebulously somewhere between private physicians that contract with prisons and public defenders. The Supreme Court holds that the former generally act under color of state law, *West*, 487 U.S. at 54, and that the latter generally do not, *Polk County*, 454 U.S. at 324-25. In some situations, a religious entity may work in tandem with a prison to fulfill the prison's constitutionally compelled duties. This type of relationship effectively places the religious entity in a role similar to that of private physicians who work in "joint effort" with the state. *See West*, 487 U.S. at 51. But in other situations, a religious entity may engage in purely religious activities that reasonable minds would be loathe to attribute to the government in light of the First Amendment, just as the Supreme Court in *Polk County* declined to treat public defenders as state actors because of the Sixth and Fourteenth Amendments. *See Polk County*, 454 U.S. at 321-22.

**[8]** Given the context-specific nature of religious entities contracting with prisons, courts confronting this question must examine the precise scope of actions of the religious entity and determine whether those actions are substitutes for traditional government actions or whether they are religious activities outside the traditional realm of government conduct. Here, although Congregation's decision to limit Florer's access to religious materials may have had a religious component, that characteristic does not alter that Congregation's conduct was a direct delegation of the DOC's constitutional duty to provide appropriate access to religious materials. If Congregation had instead been sued for its performance of religious activities that the state could not conduct itself, such as delivering sermons or praying for healing, Congregation

could not be held liable as a state actor because such religious conduct would lack "joint effort" between the state and Congregation. *See West*, 487 U.S. at 51.

**[9]** While a religious organization's right to interpret and apply its own religious dogma is a countervailing factor against attributing activity to the government, *cf. Single Moms, Inc.*, 331 F.3d at 748 (concluding that the "exercise of a [private party's] lawful First Amendment right to petition the government" is a countervailing factor), under the "fact-bound inquiry" for determining whether a private actor's conduct is fairly attributable to the government, this case is more akin to *West*. If Congregation maintained exclusive control over Florer's access to Jewish religious materials and services, which is a fair conclusion if all facts of Florer are credited and he is given all reasonable inferences, then the case would fall under the purview of *West*, because Congregation would be controlling the critical function of appropriate access that it was the duty of the state to provide. Here, in the light most favorable to Florer, the evidence indicates that Florer could access Jewish religious materials and services only through the facility chaplain, who relied exclusively on Congregation's determination that Florer was not Jewish. There is a genuine issue of material fact whether Congregation maintained exclusive control over Florer's access to Jewish religious materials and services, and so summary judgment was not correct on whether Congregation acted under color of state law.

## V

Our conclusion that for summary judgment purposes Congregation acted under color of state law is reinforced and confirmed by the "joint action" analysis outlined in the United States Supreme Court's decision in *Lugar v. Edmondson Oil Co.*, and our implementing decision in *Swift v. Lewis*, 901 F.2d 730, 732 (9th Cir. 1990). In *Lugar*, the Court held that a private party's joint participation with state officials in the

seizure of disputed property is sufficient to characterize that party as a state actor. 457 U.S. at 942. The Court held:

> Private persons, jointly engaged with state officials in the prohibited action, are acting under color of law for purposes of the statute. To act under color of law does not require that the accused be an officer of the State. It is enough that he is a willful participant in joint activity with the State or its agents . . . .

*Id.* at 941 (quotation marks omitted).

We applied this joint-action analysis in *Swift* to facts similar to those at issue here. *See* 901 F.2d at 732. In *Swift*, a prison policy exempted Sikhs from cutting their hair in accordance with their religious beliefs. *Id.* at 731. A prisoner, David R. Gren, alleged that a private party, Santok Singh Khalsa, conspired with prison officials to remove Gren from the Sikh-exemption list while Gren was still a Sikh. *Id.* at 732. We remanded to the district court in part because Gren had sufficiently alleged that Khalsa acted under color of state law, even though Khalsa was a private party:

> While the state action doctrine might seem to bar this claim, Gren has alleged that [the Arizona Department of Corrections ("ADOC")] contracted with Khalsa to help them determine whether ADOC should classify particular prisoners as Sikhs. If this allegation is true (and we must assume that it is), the state action doctrine does not bar the claim because Khalsa was a "willful participant in joint action with the State or its agents."

*Id.* at 732 n.2 (quoting *Dennis v. Sparks*, 449 U.S. 24, 27 (1980)).

**[10]** Here, there is a genuine issue whether Congregation was a willful participant in joint action with prison officials

to determine eligibility for access to Jewish materials and services. Congregation President Friedman offered to assist the DOC in determining which prisoners were Jewish. The district court acknowledged that evidence supported "the contention that [the] DOC relied on Friedman's input in determining whether prisoners should be classified as Jewish and whether they were entitled to receiving, at least, a kosher diet." The evidence included a DOC document explaining that a prisoner did not receive a religious-diet program during Passover because Friedman, "who is the authority on [the] Jewish Community," did not approve the prisoner as Jewish. The DOC Religious Program Manager declared that the DOC did not have authority to tell Congregation who was Jewish and, therefore, "the role of DOC in providing Jewish services was to refer an inmate who requested those services to Jewish Prisoner Services International, who would determine whether or not they would provide services to that inmate pursuant to Jewish law." An e-mail from a prison official to a facility chaplain explained that the facility chaplain needed to verify only with Friedman, "the Jewish Advisor to the Washington State Department of Corrections[,] . . . the validity of an offender[']s claim to being Jewish." A facility chaplain also declared that because the prison did not have any donated copies of a Torah or Jewish calendar to provide to Florer, the facility chaplain "referred his request to Jewish Prisoner Services International," who determined that Florer was not Jewish and therefore did not send him a Torah or Jewish calendar. Friedman's letter about non-Jewish prisoners participating in Jewish activities and his offer to assist the DOC in determining which prisoners were Jewish show joint action.[3]

---

[3]That the contract between Congregation and the DOC did not require that Congregation determine which prisoners were Jewish does not change the result. Under the joint-action analysis, the question is whether the private actor was a "willful participant in joint activity" with the state to have acted under color of state law. *Lugar*, 457 U.S. 941; *see also Kirtley*, 326 F.3d at 1093 ("Under the joint action test, we consider whether the state has so far insinuated itself into a position of interdependence with the private entity that it must be recognized as a joint participant in the challenged activity. This occurs when the state knowingly accepts the benefits derived from unconstitutional behavior.") (quotation marks omitted).

**[11]** Congregation contends that there is no evidence in the record that the DOC played any role with respect to Congregation's decision allegedly denying Florer's request for religious materials and that there is no evidence that Congregation's religious classification of prisoners actually became the DOC's classification. We disagree. Florer has pointed to examples of the DOC's cooperation with Congregation to determine which prisoners were Jewish and to determine which prisoners would have access to Jewish religious materials and services. Prison officials, including the DOC's Religious Program Manager, indicated that the DOC's policy was to accept Congregation's decision regarding which prisoners were Jewish. There is a genuine issue of material fact whether the DOC relied on Congregation's input regarding which prisoners were Jewish, and therefore entitled to access to Jewish religious materials and services, and whether Congregation's religious classification of inmates became the state's classification.

## VI

Viewing the evidence in the light most favorable to Florer, we conclude that Congregation acted under color of state law. We do not address other issues on the merits.[4] We reverse and remand for further proceedings in the district court not inconsistent with this opinion.

**REVERSED and REMANDED.**

---

[4]Appellees urge various alternate grounds on which we are asked to affirm the summary judgment, because we can normally affirm on any ground supported by the record. However, the only dispositive issue ruled upon by the district court was its conclusion that the actions of Congregation did not meet the required element of state action. We reverse that decision and decline to address issues not resolved by the district court.